INDIANA ALCOHOLIC BEVERAGE COMMISSION, Appellant (Respondent Below),

Indiana Liquor Stores Association, Inc., Appellant (Remonstrator—Amicus Curiae Below),

Marion County Chapter of the Indiana Liquor Stores Association, Appellant (Remonstrator—Amicus Curiae Below),

v.

OSCO DRUG, INC., Appellee (Petitioner Below),

Indiana Retail Council, Inc., Appellee (Amicus Curiae Below).

No. 1–1180–A–318.

Court of Appeals of Indiana, First District.

Feb. 18, 1982.

Linley E. Pearson, Atty. Gen., David A. Arthur, Deputy Atty. Gen., Indianapolis, for appellant.

J. B. King, Virgil L. Beeler, Francina A. Dlouhy, Baker & Daniels, Indianapolis, Robert F. Wernle, Wernle, Ristine & Ayers, Crawfordsville, for appellee.

ROBERTSON, Judge.

The Indiana Alcoholic Beverage Commission (ABC) appeals from the trial court's judgment that the ABC's decision to deny the renewal of eight beer, liquor, and wine drugstore dealer permits, held by Osco Drug, Inc., (Osco) was contrary to law. We find no reversible error.

The findings of fact and conclusions of law from which the ABC appeals, omitting formal parts, read as follows:

## I.

## FINDINGS OF FACT

1. On November 1, 1979, petitioner, Osco Drug, Inc., (Osco), pursuant to IC 7.1–3–23–11, filed its petition in these proceedings for judicial review of an order ("Order") of the respondent, Indiana Alcoholic Beverage Commission ("Commission"), dated October 31, 1979, denying Osco's applications for the renewal of eight Type 208 beer, liquor and wine drugstore permits (the "Permits") for petitioner's drugstore located in Marion County, Indiana, as follows:

| Permit No. | Location | Osco Drugstore No. |
|---|---|---|
| DL49–00132 | 8902 E. 38th St. | 761 |
| DL49–17158 | 3902 S. Madison Avenue | 762 |
| DL49–00145 | 2902 E. 46th Street | 763 |
| DL49–17159 | 1107 N. Arlington Avenue | 764 |
| DL49–00492 | 6935 Lake Plaza | 765 |
| DL49–00496 | 7803 E. Washington St. | 766 |
| DL49–17120 | 8040 South U.S. 31 | 767 |
| DL49–00223 | 6205 W. 38th Street | 768 |

2. The eight Osco Permits which are the subject of these proceedings were originally granted and issued by the Commission in December, 1977, and the Osco applications for renewal of the Permits were filed with the Commission on October 17, 1978.

3. Osco's applications for renewal of the eight Permits were initially referred by the Commission to the Marion County Alcoholic Beverage Board (the "Local Board") for its recommendation.

4. An investigation before the Local Board, pursuant to IC 7.1–3–19, was commenced on December 6, 1978. Additional information was received December 20, 1978 and January 17, 1979. During these open investigations, documentary and oral evidence was presented by both Osco and the Remonstrators and cross examination of witnesses was permitted.

5. On February 7, 1979, three (3) members of the four-member Local Board voted to recommend that the Permits not be renewed. One (1) member of the Local Board abstained from the voting since, as a recent appointee, he had not participated in the complete investigation.

6. On February 8, 1979, Osco requested in writing that the Commission hold a hearing to consider the propriety of renewing the Permits. Following the submission of briefs by Osco and the Remonstrators and oral argument held on April 17, 1979, the Commission determined on May 1, 1979, that a hearing would be held before the full Commission so that the commission could determine the fitness and qualifications of the applicant and the propriety of issuing the Permits applied for at each of the eight (8) named premises. The motion was made and adopted with the understanding that the hearing would be de novo and that the Commission would consider all reliable and relevant information which may be presented by the applicant, the Remonstrators or members of the general public, to the end that the public interest would be served best; and that the Commission could render a decision contrary to the Local Board's negative determination.

7. On May 21, 1979, the Commission notified Osco and the Remonstrators in writing that commencing on July 17, 1979, and continuing until completed, a hearing would be held before the Commission to determine the fitness and qualifications of the applicant and propriety of issuing the renewal Permits.

8. On July 17, 18, 19 and 20, 1979, the Commission held its hearing to determine the propriety of renewing the Permits. Only the Indiana Package Liquor Stores Association and its Marion County Chapter (Remonstrators) appeared at the Commission's hearing in opposition to the renewal of the Osco Permits.

9. On October 31, 1979, the Commission issued its Findings of Fact, Conclusions of Law and Adjudication and Order denying the renewal of Osco's Permits. In its Adjudication and Order, the Commission deferred to the negative recommendation of the Local Board.

10. At the Commissioner's hearing, the following facts regarding the negative recommendation of the Local Board were established by uncontradicted evidence:

(a) The negative recommendation of the Local Board was based upon each Local Board member's interpretation and application of IC 7.1–3–1–19 (the statutory "character of business" test) and the Commission's Regulation 41.

(b) Two members of the Local Board interpreted and applied IC 7.1–3–1–19 as requiring Osco to have more than 50% of its sales attributable to the main business function of a drugstore.

(c) The third voting Local Board member stated that, based upon the alcoholic beverage "laws and regulations," IC 7.1–3–1–19 could require that something more than 50% or something less than 50% of an applicant's sales be attributable to the main business function of a drugstore.

(d) In applying the statutory character of business test to Osco, two Local Board members did not define what they had concluded to be the "main business function of a drugstore".

(e) The third voting member defined the main business function of a drugstore to be "over-the-counter drugstore items (aspirin, Prescriptions, cough medicine, etc.)"

11. At the Commission's hearing, the following facts regarding the interpretation and application of IC 7.1–3–1–19 were established by uncontradicted evidence.

(a) In 1935, when the statutory "character of business test" found at IC 7.1–3–1–19 was first enacted, sales of prescription and proprietary drugs would have ranged from 5% to 20% of a typical Indiana drugstore's total sales and total sales of a typical drugstore in Indiana in 1935 would have ranged as follows:

| | Percentage of Gross Sales |
| --- | --- |
| Drugs (Rx & Proprietary) | 5 – 20% |
| Cosmetics and Toiletries | 20 – 25% |
| Tobacco Products | 20 – 25% |
| Candy | 5 – 10% |
| Fountain Sales | 20 – 25% |
| Other | 0 – 30% |

(b) The typical products of an Indiana drugstore to-day are as follows: Prescription Drugs, Proprietary Items, Cosmetics, toiletries, Stationery, Greeting Cards, Toys and Games, Cameras and Film, Appliances, Tobacco Products, Household Items, Soft Drinks, Beer and Alcoholic Beverage, Soft Goods, Paper Goods, Candy, Electronics and Seasonal Items.

(c) Except for specialty pharmacies associated with hospitals and clinics and other special situations, a typical Indiana drugstore to-day would have prescription drug sales ranging from 10% to possibly as high as 30% of its total gross sales.

12. At the Commission's hearing, the following facts concerning the operations of the eight Osco drugstores and comparing the Osco drugstores to the operations of typical Indiana drugstores were established by uncontradicted evidence:

(a) Pharmacy licenses for each of the eight Osco drugstores had been duly issued by the Indiana State Board of Pharmacy on January 9, 1978, with a December 31, 1979, expiration date.

(b) During the time Osco had operated under the Permits Osco has never had a citation issued by the Commission against any of its eight Marion County drugstores.

(c) Each of the eight Osco drugstores has greater than 50% of its sales attributable to sales of typical products of a drugstore in Indiana to-day.

(d) The annualized dollar volume of prescription sales, the annualized number of prescriptions filled and the percentages of prescription sales to gross sales for each Osco drugstore were as follows:

| Store No. | Prescription Sales | Prescriptions Filled | % of Total Sales Attributable to Prescription |
|---|---|---|---|
| 761 | $231,584 | 35,628 | 10.7 |
| 762 | 266,349 | 40,977 | 12.5 |
| 763 | 213,422 | 32,834 | 13.66 |
| 764 | 260,459 | 40,071 | 11.7 |
| 765 | 315,077 | 48,473 | 11.6 |
| 766 | 188,855 | 29,055 | 11.8 |
| 767 | 219,308 | 33,740 | 11.1 |
| 768 | 233,683 | 35,951 | 10.8 |
| Avg. | $241,092 | 37,091 | |

(e) The annual dollar volume of prescription sales, the annual number of prescriptions filled and the percentages of prescription sales to total sales were for each Osco drugstore within the ranges of prescription sales data for typical Indiana drugstores in all three categories, viz., annual dollar volume of prescription sales, number of prescriptions annually filled and percentages of prescription sales to total sales.

13. At the Commission's hearing the following facts regarding the interpretation and application of the Commission's Regulation 41 were established by uncontradicted evidence:

(a) Regulation 41, as recognized in the Commission's Brandon circular, imposed upon county alcoholic boards a mandatory 50% test in applying the statutory "character of business" test.

(b) The "main business function" of a drugstore as that term was used in Regulation 41 was diversely defined:

(i) to be "drugs, as state in the printed version of Regulation 41,

(ii) to be "over-the-counter drugstore items (aspirins, prescriptions, cough medicine, etc.)", as stated in the Commission's Brandon circular, and

(iii) to be "drugs, cosmetics and other salable commodities used by the public or in one's home or business," as stated in Regulation 41 as introduced for promulgation, as made available for public inspection and as discussed and considered for promulgation at the public hearing thereon and at the meetings of the Commission in respect thereto.

(c) Contemporaneously with the promulgation of Regulation 41, the Chairman of the Commission had stated that the sole purpose for the deletion in the printed version of the Regulation of the words "cosmetics and other salable commodities used by the public or in one's home or business: from the definition of the main business function of a drugstore was simply to shorten the verbiage and not to change the meaning of the original definition of the main business function of a drugstore.

(d) Over 50% of Osco's sales are the sale of "drugs, cosmetics and other salable commodities used by the public or in one's home or business."

14. The Commission declined to interpret itself and apply Regulation 41 to denying the renewal of Osco's Permits.

15. The Commission in its Finding of Fact No. 16 found that the negative recommendation of the Local Board was not based on Regulation 41, but was based on an interpretation of the Alcoholic Beverage Act by the Local Board members, presumably reflecting community sentiment. Such finding of fact is refuted by uncontradicted evidence. All three voting members of the Local Board relied upon Regulation 41 in interpreting IC 7.1–3–1–19, the statutory "character of business" test.

16. In its Finding of Fact No. 16, the Commission also made the convoluted finding that "The Alcoholic Beverage Board of Marion County determined that a substantial portion of the business of the eight (8) Osco stores was not in the nature of the main business function of a drugstore." But the Commission failed to find that either it or the Local Board had found that the Osco drugstores did not have a substantial portion of their business in the nature of the main business function of a drugstore, the positive requirement of IC 7.1–3–1–19.

17. The Commission failed to make a finding with respect to IC 7.1–3–1–19 on what it considers to be "In the nature of the main business function of a drugstore" and what it considers to be a substantial portion.

18. Until February 7, 1979, when all three members of the Local Board applied Regulation 41 to Osco's renewal applications, that Board and, in fact, no other Indiana county alcoholic beverage board had ever applied Regulation 41 to a drugstore permittee although, except for specialty pharmacies associated with hospitals and clinics, a typical Indiana drugstore would not have fifty percent (50%) or more of its gross sales attributable to the sale of prescription and over-the-counter drugs.

19. From July 1, 1976, until July 17, 1979, the Commission had granted and renewed over 84 drugstore permits but had never denied or revoked a drugstore permit on the grounds that it failed to satisfy Regulation 41.

20. The Commission's determination reflected its opinion that the strong, overriding legislative policy of the Alcoholic Beverage Act was and is that local communities, through their elected and appointed representative, should be free to exercise considerable discretion in selecting the types of alcoholic beverage outlets they desire in their community.

21. The Commission further concluded: That while it may disagree with how a Local Board exercises its discretion in a particular case and could arrive at a different conclusion, as to the weight of the evidence, absent unlawful or improper conduct or other exceptional circumstances, the desire of the local community, as expressed by the Local Board members, may not be overturned by the Commission. That the Commission review of a negative Local Board recommendation is the same as or similar to a court review of an agency's determination under the Administrative Adjudication Act. That the Local Board's recommendation should be deferred to unless that recommendation is:

(1) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; or

(2) Contrary to constitutional right, power, privilege or immunity; or

(3) In excess of statutory jurisdiction, authority or limitations, or short of statutory right.

22. This court's right of review is limited to a consideration of whether there is any substantial evidence to support the finding and order of the Commission. This court may also determine whether or not the action of the Commission exceeded its authority and constituted an abuse of discretion or was arbitrary or capricious.

CONCLUSIONS OF LAW

Based upon the above Findings, the Court does now conclude:

1. This Court has jurisdiction of the subject matter, of the parties and of this cause.

2. This action is brought by Osco for judicial review of the Commission's Order pursuant to IC 7.1–3–23–11, which subjects these proceedings to the "administrative hearing" requirements and "judicial review" standards of the Administrative Adjudication Act. Under that Act, a court may order the decision or determination of an agency set aside if the court finds such decision or determination is:

(1) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; or

(2) Contrary to constitutional right, power, privilege or immunity; or

(3) In excess of statutory jurisdiction, authority or limitations, or short of statutory right; or

(4) Without observance of procedure required by law; or

(5) Unsupported by substantial evidence.

3. The law is with Osco and against the Commission.

4. The statutes specifically relevant to the renewal of the Permits are:

IC 7.1–1–3–15, which provides:

"Sec. 15. Drug Store. The term "drug store" means a retail business establishment in which medicines and miscellaneous articles are sold."

IC 7.1–2–4–6, which provides:

"Sec. 6. Appointments. A local board shall be composed of three (3) appointed

members and one (1) designated member. One (1) of the appointed members shall be appointed by the board of county commissioners of the county in which the board is to perform its duties. One (1) of the appointed members shall be appointed by the county council of the county in which the board is to perform its duties. One (1) of the appointed members shall be appointed by the mayor of the city within the county having the largest population. The designated member of the board shall represent the commission and shall be designated by the commission."

IC 7.1–3–1–19, which provides:

"Sec. 19. Character of the Business Test. Whenever the character of the business in which an applicant is engaged is material to his being issued a permit under this article, or is material to his being qualified to continue to hold the permit, it must be made to appear to the satisfaction of the commission that a substantial portion of the business carried on, or to be carried on, in the premises in respect to which a permit is applied for is in the nature of the applicant's main business function in the premises."

IC 7.1–3–10–2, which provides:

"Sec. 2. Drug Stores. The commission may issue a liquor dealer's permit to the proprietor of a drug store who holds a license issued by the state board of pharmacy. An applicant for a liquor dealer's permit for a drug store shall not be disqualified under IC 1971, 7.1–3–4–2(m)."

IC 7.1–3–19–11, which provides:

"Sec. 11. Deference to Local Board. The commission shall decline the application for a retailer's or dealer's permit of any type if a majority of the members of the local board recommend that the permit not be granted."

IC 4–22–1–24, which provides:

"Applications for licenses or permits— Exceptions for act—Right of applicant to hearing on denial of license or permit— Procedure. The provisions of this act (4–22–1–1—4–22–1–30) shall not apply to the proceedings for the issuance of licenses or permits on application but the proceeding for such license or permit by such proceedings shall be under the provisions of the law relating to the particular agency, however, whenever an application for a license or permit is denied under the provisions of the law relating to a particular agency such applicant shall be entitled to have a hearing before the ultimate authority of such agency on such denial upon filing within fifteen (15) days after receipt of notice of such refusal a written application for such hearing. Notice shall be given in the manner prescribed by section 6 (4–22–1–6) of this act. At such hearing said applicant shall be the moving party and have the burden of proof. Such hearing shall be conducted in accordance with the provisions of this act for hearing before an agency. Such hearing before the ultimate authority of such agency shall be limited to those matters originally presented to the agency for its determination on such application."

IC 4–22–1–26, which provides:

"Authority of agency to modify order or determination—Right of judicial review—In addition to any other power existing by statute or law to modify its order or determination every agency shall have authority to modify any order or determination during the time within which a judicial review could be had thereof. Any person aggrieved by any such modification may have a judicial review thereof as provided herein for reviews of agency determinations."

and IC 4–22–1–30, which provides:

"Provisions controlling.—The provisions of this act (4–22–1–1—4–22–1–30) shall supersede or control the provisions of any general or special act or part of act in conflict herewith, passed by this general assembly, regardless of whether such act or acts were passed before or after the effective date (March 14, 1947) of this act."

5. The statutes specifically relevant to judicial review are:

IC 7.1–3–23–11, which provides:

"Nonrenewal of permit—Judicial review available—Whenever an application for the renewal of a permit to sell alcoholic beverages at retail, except a temporary beer or wine permit, is denied by the commission, the applicant may seek judicial review of that action by following the applicable provisions of IC 1971, 4–22–1 (4–22–1–1—4–22–1–301), except that the action for judicial review shall be filed in the circuit or superior court having jurisdiction in the county in which the licensed premises are located. However, this section shall not apply to a denial of a transfer of a permit to either another holder, or location or both."

and IC 7.1–2–3–9, which provides:

"The commission shall have the discretionary authority to issue, deny, suspend, revoke or not renew all permits authorized by this title, unless the exercise of discretion or authority is limited by applicable provisions of this title."

6. All these statutes are to be interpreted and construed in accordance with the following long-established rules of statutory construction:

(a) A statute should be construed so as to ascribe to the words used therein "their plain or ordinary and usual sense."

(b) A statute should be construed "in the light of the factual and legal situation existing at the time of its enactment."

(c) A statute should be construed so as not to reach or produce an absurd result.

7. The Legislature intended that the statutory "character of business" test (IC 7.1–3–1–19) is to be interpreted by the Indiana Alcoholic Beverage Commission, not 92 different county alcoholic beverage boards because the statute expressly requires that "it must be made to appear to the satisfaction of the Commission" that the test has been met.

8. The legislative intent of the Alcoholic Beverage Act is that the Commission be responsible for promulgating regulations which bring about a reasonable uniformity in the State with respect to the application of the Act, and Regulation 41 in its promulgation and application fails to perform such a function, and the application of it by the local board in this case is compelling evidence of the failure of the Commission to perform its statutory duties.

9. The word "substantial", as used in the statutory "character of business" test means in its ordinary and usual sense something more than a nominal amount, but does not mean 50% or more.

10. The word "substantial" as used in the statutory "character of business" test now set forth at IC 7.1–3–1–19 is to be construed in the light of the factual situation existing at the time of its first enactment in 1935, viz., that the prescription and proprietary drug sales of typical Indiana drugstores ranged from 5% to 20% of the drugstore's total sales.

11. The phrase "in the nature of the applicant's main business function" as applied in IC 7.1–3–1–19 to drugstores means in its ordinary and usual sense the retail sale of products of a kind typically found in a drugstore.

12. The mandatory 50% requirement imposed by Regulation 41 upon county alcoholic beverage boards in considering and applying the statutory "character of business" test is inconsistent with IC 7.1–3–1–19 and exceeds the "substantial portion" requirement of that statutory test, and is an arbitrary and erroneous application of the law.

13. The Order of the Commission denying the renewal of the eight Osco Permits was not in accordance with law for the reason that the Commission in its Order erroneously deferred to the negative recommendation of the Local Board, which recommendation was in turn based upon an erroneous interpretation of IC 7.1–3–1–19, the statutory "character of business" test, to-wit: That Osco was required to have 50% or more of its sales in the nature of its main business function.

14. The Order of the Commission denying the renewal of the eight Osco Permits was not in accordance with law and was not supported by substantial evidence for the

further reason that the uncontradicted evidence established that each of the eight Osco drugstores is a drugstore and carries on a substantial portion of its business in the nature of the main business function of a drugstore whether considered in light of a typical Indiana drugstore in 1935 when the character of business test was first enacted—or today.

15. The Administrative Adjudication Act required the Commission to make sufficient findings of basic and ultimate fact so as to enable this Court to conduct a meaningful judicial review of the Commission's Order.

16. The Commission failed to make the necessary findings of basic and ultimate facts as to what constitutes the "main business function of a drugstore", as to what is to be considered as being "in the nature" of the main business function of a drugstore, and as to what is a "substantial portion" under the statutory "character of business" test and therefore the Commission's Order was made without observance of procedure required by law—viz., the finding requirements of the Administrative Adjudication Act.

17. The Commission by declining to interpret itself and apply Regulation 41 in denying the renewal of Osco's Permits failed to make a necessary finding sufficient to enable the Court to determine whether the Commission, by its deletion of the words "cosmetics and other salable commodities used by the public or in one's home or business" from the definition of the main business function of a drugstore as set forth in the printed version of Regulation 41, intended to change the meaning of that definition or merely to shorten the verbiage thereof. The Commission by failing to make such necessary finding has precluded the Court from determining whether Regulation 41 was properly promulgated under IC 4–22–2–1, et seq. and, thus, its Order was entered without observance of the procedures required by law—viz., the findings requirement of the Administrative Adjudication Act.

18. The Administrative Adjudication Act required the Commission to give Osco notice of the nature of its hearing. This "notice" requirement was violated by the Commission when, after notifying Osco and also stating at its hearing that such hearing was to be held on a "de novo" basis "so that the Commission may determine the fitness and qualifications of the applicant (Osco)", the Commission conversely ruled in its Order that it would treat its hearing as a "review hearing" and it would not itself determine the fitness and qualification of Osco for the renewal of the Permits. Consequently, the Commission's Order was made without observance of procedure required by law—viz., the statutory notice requirement of the Administrative Adjudication Act.

19. The statutory "character of business" test is to be interpreted and uniformly applied throughout the state. The negative recommendation of the Local Board based on a "character of business test" (namely, the 50% standard of Regulation 41) which the Local Board had never applied to any other drugstore permittee was unlawfully discriminatory and the Commission's deference to that negative recommendation was also unlawfully discriminatory since such 50% test had never been applied by the Commission itself to any other drugstore permittee to deny a permit.

20. Although not an issue between Osco and the Commission, i.e., the real parties in interest to this proceeding the Commission in its Order correctly ruled that pursuant to IC 7.1–3–23–11 and the Administrative Adjudication Act, it could grant Osco's renewal application notwithstanding the Local Board's 3–0 negative recommendation.

The often referred to Regulation 41, 905 IAC 1–22–1, reads:

Permits Dependent on Other Business: Gross Sales:

Sec. 1. It is apparent that the legislative purpose is to require that any person who applies for a new alcoholic beverage permit or who is issued a new permit under this title [IC 7.1], must prove to the Commission that a substantial portion of the

business carried on at said premises is that type of business which qualifies him to hold such permit (such as: a restaurant's main business function is the retail sale of food, and a grocery store's main business function is the retail sale of food, and a drug store's main business function is the retail sale of drugs).

It shall be presumed that if the applicant proves to the Local Board and Commission that at least fifty percent (50%) of its gross sales is attributed to its main business function that this requirement is fulfilled.

In the event the applicant has less than fifty percent (50%) of its gross sales attributed to its main business function, the Commission may allow the applicant to present further evidence upon which the Commission may make a determination as to whether said applicant is qualified to hold such permit.

When a new permit is issued to a person subsequent to July 1, 1976, he shall submit an affidavit on forms and in the manner prescribed by the Commission ninety (90) days after the date business is commenced on the permit premises, showing to the Commission the percentage of the gross sales attributed to the main business function which qualifies said person to hold his permit.

When a new permittee files an application for renewal of a permit that was issued subsequent to July 1, 1976, he shall include along with the application an affidavit on forms and in the manner prescribed by the Commission showing to the Commission the percentage of the gross sales for the previous year attributed to the main business function which qualifies such permittee to hold the permit.

For the purpose of implementing the aforesaid, the Commission may demand that the applicant furnish an accountant's certification to such effect. The accountant's certification would be due in the Commission's office within sixty (60) days of such demand. When said permittee hereinabove mentioned files an application for renewal of a permit that was issued subsequent to July 1, 1976, he shall include along

with the application an affidavit on forms and in the manner prescribed by the Commission showing the Commission the percentage of the gross sales for the previous year attributed to the main business function which qualifies such permittee to hold his permit. The Commission may demand that the applicant furnish an accountant's certification to such effect. The accountant's certification would be due in the Commission's office within sixty (60) days of such demand.

If the Commission finds that a person's gross sales are not substantial as herein defined, the Commission may revoke his permit, only after a period of sixty (60) days is granted to the person by the Commission in order that he may prove to the Commission that his gross sales are substantial as herein defined.

This regulation shall not apply to any retailer's or dealer's permit, or any renewal thereof, which permit was originally issued prior to July 1, 1976. (*Indiana Alcoholic Beverage Commission; Reg. 41; filed Aug. 5, 1976, 3:10 pm: Rules and Regs. 1977, p. 102*).

Additionally, in December, 1977, the ABC sent to the local boards a letter which reads in pertinent part:

It is apparent that some Alcoholic Beverage Commission employees and many local board members are not aware of past changes in regulations regarding new permits, and a new law regarding two-way restaurants in fourth or fifth class cities. Therefore, we are enclosing a brief explanation of the aforementioned changes.

### REGULATION REGARDING SUBSTANTIAL SALES IN MAIN COURT OF BUSINESS

This regulation affects any *new* permit issued after July 1, 1976. It states that at least 50% of the gross sales made on the permit premises must be of merchandise directly identifiable with the permittee's principal business. For example, a grocery permit issued after July 1, 1976

must have at least 50% of its total sales in grocery items. *A drug store must sell at least 50% of its total* sales in over-the-counter drug store items (aspirins, *prescriptions, cough medicine, etc.*) A restaurant . . . one, two, or three-way, must have at least 50% of its sales in the retail sale of food. (Emphasis added.)

If these permittees do not meet this requirement, they do not qualify to hold their new permit.

 In construing the several statutes and regulations involved herein, we are bound by some familiar rules of statutory construction, I.C.1971, 1–1–4–1; I.L.E. Statutes §§ 101–195. The bedrock rule of statutory construction is that a statute clear and unambiguous on its face need not and cannot be interpreted by a court. *Morgan County R. E. M. C. v. Indianapolis Power & Light Co.* (1973), 261 Ind. 323, 302 N.E.2d 776; *Knox County R. E. M. C. v. Public Service Commission of Indiana* (1966), 139 Ind.App. 547, 213 N.E.2d 714; *Meade Electric Co. v. Hagberg* (1959), 129 Ind.App. 631, 159 N.E.2d 408. A cardinal principle of statutory construction mandates the court to interpret ambiguous statutes in order to ascertain and effectuate the general intent of the legislature. *Wayne Township v. Lutheran Hospital* (1974), 160 Ind.App. 427, 312 N.E.2d 120; *Kirby v. Indiana Employment Security Board* (1973), 158 Ind.App. 643, 304 N.E.2d 225; *Morgan City R. E. M. C., supra; Thompson v. Thompson* (1972), 259 Ind. 266, 286 N.E.2d 657. Similarly, the spirit of an enactment will prevail over the letter of the law. *Town of Kewanna Water Works v. Indiana Employment Security Board* (1961), 131 Ind.App. 400, 171 N.E.2d 262. Another fundamental rule of statutory construction is that if a statute is susceptible to more than one interpretation, then the court may consider the consequences of a particular construction. *Boles v. State* (1973), 259 Ind. 661, 291 N.E.2d 357; *In re Annexation of Certain Territory* (1965), 138 Ind.App. 207, 212 N.E.2d 393, *reh. den.*, 138 Ind.App. 207, 213 N.E.2d 349; *Fogle v. Pullman Standard Car Manufacturing Co.* (1961), 133 Ind.App. 95, 173 N.E.2d 668. There is a strong presumption that the legislature in enacting a particular piece of legislation is aware of existing statutes on the same subject. *Morgan County R. E. M. C., supra; Chaffin v. Nicosia* (1973), Ind. App., 297 N.E.2d 904. Statutes relating to the same general subject matter are in pari materia and should be construed together so as to produce a harmonious system. *State ex rel. Moore v. Smock* (1973), 156 Ind.App. 158, 295 N.E.2d 857; *Porter Memorial Hospital v. Harvey* (1972), 151 Ind. App. 299, 279 N.E.2d 583. In this respect, when two statutes on the same subject must be construed together, the court should attempt to give effect to both; however, where the two are repugnant in any of their provisions, then the later statute will control and operate to repeal the former to the extent of the repugnancy. *State ex rel. Todd v. Hatcher* (1973), 158 Ind.App. 144, 301 N.E.2d 766; *Chaffin, supra.* Similarly, where one statute deals with a subject in general terms and another statute deals with a part of the same subject in a more detailed or specific manner, then the two should be harmonized, if possible; but if they are in irreconcilable conflict then the more detailed will prevail as to the subject matter it covers. *State ex rel. Todd, supra; Chaffin, supra; Citizens Gas & Coke Utility v. Sloan* (1964), 136 Ind.App. 297, 196 N.E.2d 290, *reh. den.*, 136 Ind.App. 297, 197 N.E.2d 312.

 Another fundamental rule of statutory construction is that a statutory amendment changing a prior statute indicates a legislative intention that the meaning of the prior statute has been changed. This raises a presumption that the legislature intended to change the law unless it clearly appears that the amendment was made only to express the original intention of the legislature more clearly. *Daubenspeck v. City of Ligonier* (1962), 135 Ind. App. 565, 183 N.E.2d 95, *transf. den.*, 245 Ind. 20, 191 N.E.2d 100; *Board of Commissioners of Perry County v. Sweeney* (1962), 134 Ind.App. 33, 181 N.E.2d 241; *Opp v. Davis* (1962), 133 Ind.App. 365, 179 N.E.2d 298 *reh. den.*, 133 Ind.App. 365, 180 N.E.2d 788. Another recognized rule of statutory

construction is that if the legislature fails to change a statute administered by a state agency, then this inaction indicates the legislature's acquiescence in and satisfaction with the administrative construction. *State Board of Tax Commissioners v. Wright* (1966), 139 Ind.App. 370, 379, 217 N.E.2d 596; *Baker v. Compton* (1965), 247 Ind. 39, 211 N.E.2d 162. The Indiana ·Supreme Court in *Baker* stated:

> "We recognize the established authority that a long adhered to administrative interpretation dating from the legislative enactment, with no subsequent change having been made in the statute involved, raises a presumption of legislative acquiescence which is strongly persuasive upon the courts." 211 N.E.2d 164.

The Court then continued:

> "Although the interpretation placed upon the statutes by an administrative agency of the state may not be binding upon this Court if the interpretation is incorrect, such interpretation as has been made and applied in a number of previous adoptions, is entitled to considerable weight, not only to insure the stability of adoption proceedings brought pursuant thereto for a number of years, but as evidence of the meaning of the statute to those charged by law and most concerned with its administration." 211 N.E.2d 164.

The first error claimed by the ABC is that the trial court erred in holding that the local board vote was based upon Regulation 41. ABC argues that the trial court had to enter the forbidden realm of weighing the evidence in concluding differently from the Commission's finding that the local board's vote was based upon the character of business test set forth in IC 7.1–3–1–19. Our reading of the trial court's findings in this regard does not support the position taken by the ABC for the reason that the trial court found the board's decision was based upon both the statute and the regulation. The record clearly shows that the three voting members of the local board placed substantial reliance upon Regulation 41 in determining whether to vote for or against OSCO's renewal. Two of the three asserted their belief in oral and written statements that 50% of OSCO's sales must be attributable to the main business function of a drug store, namely prescriptions and proprietary drugs. ″ The third was equivocal in whether to require more or less than 50%. Nonetheless, it is apparent that Regulation 41, as it related to 50% of total sales being attributable to the main business function, played a significant role in shaping the opinion of the local board members.

■ The ABC next asserts error in the trial court's ruling that only the Commission can apply the "character of business" test. This argument includes a discourse upon the importance of the relationship between local boards' duties of investigation and monitoring permittees. While we agree the local board plays a vital role in the licensing procedure, their acts must be measured by the statutes involved. We are of the opinion that the position assumed by the ABC on this issue overlooks the plainly worded mandate contained in IC 7.1–3–1–19 stating ". . . it must be made to appear to the satisfaction of the commission . . ." that the character of business test must be met whenever applicable. The duty of the Commission is clear and the statute makes no provision for delegation of the responsibility. This is not to say that input and assistance from the local board is to be ignored. However, ultimate responsibility for determination is statutorily vested in the Commission.

■ ABC's third issue claims the trial court's holding that typical drugstores are entitled to be licensed to sell alcoholic beverages is erroneous. We first note that underlying the ABC argument is a theme that "typical" equates with normal, average, or even mediocre, leaving the impression that typicality is not desirable for permittees who must have a high and fine reputation in the community. However, that need not be the case. Webster's Third New International Dictionary defines "typical", among other things, as combining or exhibiting the essential characteristics of a group sharing the nature of a type. It is very conceivable therefore, that a group, such as

drug stores, may be both typical as well as of a high and fine character.

More importantly, however, in the context of this issue, is the ABC's position of what constitutes the main business function of a drug store. IC 7.1–1–3–15 defines a drugstore as a retail business in which medicines and miscellaneous articles are sold. ABC contends that the sale of miscellaneous items cannot be included in the main business function of a drug store. While it is true that IC 7.1–1–3–15 does not define the main business function of a drug store, we are of the opinion it cannot be separated from the overall consideration of main business function. Webster's Third New International Dictionary defines "miscellaneous", in pertinent part, as: comprising members or items of different kinds; grouped together without system; having various traits; and, lacking in unity. Therefore, in using the word "miscellaneous" in its usual and ordinary meaning, it becomes obvious that virtually any article a drug store sells is to be included in the scope of its business. The statutory definition appears to be without limitation and does not limit the ABC to considering only prescriptions and proprietary drugs in determining the main business function as stated in Regulation 41. It becomes axiomatic then that if the main business function of a drug store is the retail sale of medicine and miscellaneous articles, OSCO comfortably fits into the consideration stated in IC 7.1–3–1–19 that a substantial portion of the applicant's business is in the nature of the applicant's main business function.

ABC next argues that the trial court erred in holding in its conclusion # 17 that Regulation 41 was improperly passed. Our reading of conclusion # 17 indicates a trial court ruling that it could not determine from the Commissioner's order whether or not Regulation 41 was promulgated according to the provisions of IC 4–22–2–1 et seq. Neither are we directed by the parties to this appeal to a direct statutory failure to comply with the required procedure to promulgate a regulation, hence we see no error in this issue. It is true, as pointed out by OSCO, that the "amendment by dele-

tion" of a phrase from the proposed regulation may raise some eyebrows, however, we have not been directed to a clear-cut illegality. While the trial court's ruling in this regard may have been erroneous, it does not rise to the category of reversible error.

ABC next argues that the trial court erroneously held that OSCO had been denied equal protection. This assertion is in reference to the fact that the ABC had approved 84 drugstore permits (including an OSCO drugstore in northern Indiana) but this denial was the first to invoke Regulation 41 and, incidentally, the first time remonstrators had ever appeared against the renewal of a drugstore permit. As in the previous issue we do not deem the error in the findings, if any, as reversible for the reason the ABC supposedly acted within the bounds of good faith in applying the presumptions of Regulation 41.

The next issue relates to the trial court's holding that the Commission failed to make sufficient findings of fact. ABC's argument on this issue seems to focus again on what constitutes a substantial portion of the main business function of a drugstore, more notably whether or not that phrase can be quantified into specific percentages. Since we have heretofore held that a substantial portion of the main business function constitutes the retail sales of medicine and miscellaneous articles, we believe this issue has been addressed adversely to the ABC's position.

ABC next argues that it was error to hold that improper notice of the Commission hearing was given. Both parties appeared and presented evidence at that hearing and it is evident that neither of the parties were harmed by defective notice, if any. Since there was no harm, the trial court's ruling, if in error, does not justify reversal.

■ ABC's final issue asserts a violation of the separation of powers enunciated in Article III, § 1, of the Indiana Constitution by the trial court when it ordered the Commission to reconsider the denial of OSCO's permits. It is true that the trial court could not order the issuance of the permits by the

Commission. *Indiana Alcoholic Beverage Commission v. Lamb* (1971) 256 Ind. 65, 267 N.E.2d 161. However, we believe the trial court's judgment to be plain on its face as ordering a reconsideration. The ABC fails to show us how or why a reconsideration is a constitutional flaw.

Judgment affirmed.

RATLIFF, P. J., and NEAL, J., concur.