UNISYS CORPORATION, Raymond W. Ross, Jr., individually and on behalf of a class of all others similarly situated, Mellon Bank, N.A., as Trustee under Trust Agreement dated August 27, 1991, of the UNISYS Employee Savings Thrift Trust, Commonwealth of Pennsylvania, by its Attorney General, Ernest D. Preate, Jr. (As to Counts One and Two), and Cynthia M. Maleski, in her capacity as Insurance Commissioner of the Commonwealth of Pennsylvania (As to Counts One and Two), Petitioners,

v.

PENNSYLVANIA LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION, an unincorporated association and Cynthia M. Maleski, in her capacity as Insurance Commissioner of the Commonwealth of Pennsylvania (As to Count Three), Respondents.

Commonwealth Court of Pennsylvania.

Argued Sept. 12, 1995.

Decided Nov. 14, 1995.

Order Amending Decision Dec. 14, 1995.

David H. Pittinsky, for petitioners Unisys Corporation, Raymond W. Ross, Jr., and Mellon Bank, N.A.

David L. Bricker, Special Funds Counsel, for petitioner/respondent Cynthia M. Maleski, Insurance Commissioner.

Jane Leslie Dalton, for respondent Pennsylvania Life and Health Insurance Guaranty Association.

Before DOYLE and McGINLEY, JJ., and NARICK, Senior Judge.

McGINLEY, Judge.

Presently before this Court is the motion for summary judgment filed by UNISYS Corporation (UNISYS), Mellon Bank, N.A., as trustee (Mellon) and Raymond W. Ross, Jr., individually and on behalf of a class of all others similarly situated (Ross) (collectively, Petitioners).

UNISYS is a Delaware corporation that established a Savings Plan and a Retirement Plan (Plans) to encourage savings and to provide retirement and other benefits to the employees of UNISYS who are members of the Plans.[1] The members contribute a portion of their compensation to the Plans and UNISYS matches those contributions. The Plans consist of several different investment funds including a Fixed Income Fund and/or an Insurance Fund (Funds). In 1987 and 1988 the Funds purchased four contracts [2] (Contracts) from Executive Life Insurance Company (Executive Life), a California insurance company, licensed to transact business in Pennsylvania. The Contracts were purchased by Mellon, who besides being the

---

1. The Plans are "defined contribution" retirement plans under Section 401(k) of the Internal Revenue Code, 26 U.S.C. § 401(k).

2.

| Contract Number | Issue Date | Maturity Date | Value as of 3/31/91 | Interest Rate |
|---|---|---|---|---|
| CG01238A3A | 7/1/87 | 6/30/93 | $17,724.35 | 9.405% simple |
| CG01238B3A | 7/1/87 | 6/30/93 | $17,471,438.06 | 9.405% simple |
| CG01267A3A | 1/5/88 | 12/31/92 | $116,542,123.59 | 9.75% compd. |
| CG01279A3A | 4/1/88 | 6/30/92 | $43,999,053.43 | 9.48% compd. |

trustee of the Plans, is the legal owner of the Contracts.

In 1991 Executive Life was found to be insolvent in proceedings before the California Superior Court and liquidation proceedings commenced. In 1993 the California Superior Court approved a rehabilitation plan for Executive Life which included a purchase and sales agreement with Aurora National Life Insurance Company (Aurora) and an enhancement agreement with the National Organization of Life and Health Insurance Guaranty Associations, of which the Pennsylvania Life and Health Insurance Guaranty Association (PLHIGA) is a member.[3] The rehabilitation plan offered the UNISYS Plans the choice of choosing either a "restructured contract" issued by Aurora or liquidation payments. The Plans elected to receive the liquidation share of Executive Life's assets. On March 29, 1994, the Plans received a liquidation payment of fifty-eight percent of the total contract value and on March 16, 1995, an additional eleven and one-half percent for a total of approximately $124 million of the $178 million of principal due under the Contracts.

Petitioners filed an amended complaint requesting a declaratory judgment that the Contracts are annuity contracts and seeking coverage for the unpaid principal and interest due Pennsylvania resident participants as a result of Executive Life's insolvency (Count One and Count Two of the amended complaint).[4] At Count Three of the amended complaint UNISYS seeks coverage from PLHIGA for the unpaid principal and interest due non-resident participants.[5] PLHIGA denies the Contracts are annuity contracts

and asserts they are not "covered policies" under the 1978 Act.[6]

In support of its motion for summary judgment Petitioners contend: 1) that the Contracts issued to the Plans are annuity contracts and are "covered policies" under the 1978 Act; 2) that Mellon in its capacity as Trustee of the Plans and legal owner of the Contracts is a "resident" as defined under the 1978 Act and is entitled to the performance of contractual obligations by PLHIGA; 3) that Pennsylvania resident participants (resident participants) in the Plans who invested in the Contracts are eligible for coverage up to the statutory limits under the 1978 Act; 4) that non-resident participants who invested in the Contracts are also eligible for insurance coverage by PLHIGA up to the statutory limits under the 1978 Act; and 5) that Ross and resident participants represent a separate and distinct life for purposes of insurance coverage under the 1978 Act.

■ Pa.R.C.P. 1035(b) provides that summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment is appropriate in an action where the parties are seeking declaratory relief. *Pennsylvania Medical Society v. Foster,* 154 Pa. Cmwlth. 562, 624 A.2d 274 (1993).

### Annuity Contracts

Initially, UNISYS contends that although the 1978 Act does not define the term "annuity" our Pennsylvania Supreme Court has

---

**3.** Section 5 of the Life and Health Insurance Guaranty Association Act (1978 Act), Act of November 26, 1978, P.L. 1188, *as amended, formerly* 40 P.S. § 1805 provides that "[t]here is created a nonprofit, unincorporated association known as the Pennsylvania Life and Health Insurance Guaranty Association" and that "[a]ll member insurers shall be and remain members of the association as a condition of their authority to transact insurance in this Commonwealth." The 1978 Act was repealed by the Act of December 18, 1992, P.L. 1519 (1992 Act). Section 21 of the 1992 Act provides that "[n]otwithstanding the repeal in section 20, any insurer declared insolvent by a court of competent jurisdiction

prior to the effective date of this act shall be governed by ... 1978 ... Act."

**4.** The Insurance Commissioner and the Attorney General join Petitioners as Plaintiffs in Count One and Count Two of the amended complaint.

**5.** The Insurance Commissioner and the Attorney General join PLHIGA as defendants as to Count Three of the amended complaint.

**6.** Section 4 of the 1978 Act, *formerly* 40 P.S. § 1804 defines "covered policy" as "[a]ny policy or contract within the scope of this act."

defined "annuity" and the characteristics of it. UNISYS asserts that the Contracts have the characteristics of an "annuity" and that the Insurance Commissioner approved the Contracts for sale as "annuity" contracts.

Section 2 of the 1978 Act, *formerly* 40 P.S. § 1802 provides that "[t]he purpose of this act is to protect policyholders, insureds, beneficiaries, annuitants, payees, and assignees of ... *annuity contracts* ... against failure in the performance of contractual obligations due to the impairment or insolvency of the insurer issuing such policies or contracts." (emphasis added). Section 3(a) of the 1978 Act, *formerly* 40 P.S. § 1803(a) provides that "[t]his act shall apply to direct written individual and group life insurance policies, health and accident insurance policies, *annuity contracts* ... and contracts supplemental thereto...." (emphasis added).

In *Dwight Estate,* 389 Pa. 520, 134 A.2d 45 (1959) our Pennsylvania Supreme Court again reiterated the characteristics which determine whether a contract is an "annuity." The Supreme Court stated:

> In *Commonwealth v. Beisel,* 338 Pa. 519, 521, 13 A.2d 419, former Chief Justice Stern very aptly defined an 'annuity' as a '... term somewhat loosely used in financial and legal nomenclature and is perhaps incapable of exact definition. Generally speaking, it designates a right-bequeathed, donated or purchased-to receive fixed periodical payments, either for life or a number of years. Its determining characteristic is that the annuitant has an interest only in the payments themselves and not in any principal fund or source from which they may be derived.'

*Id.* at 525, 134 A.2d at 48 *quoting Beisel,* 338 Pa. at 521, 13 A.2d at 420–21. Also, Black's Law Dictionary defines the term "group annuity contract" as "[a] contract to make periodic payments to a member of a group covered by such contract" and that "[t]he usual type is a pension plan providing annuities upon retirement for individual employees under a master contract." Black's Law Dictionary 83 (5th ed. 1979).

In *Board of Trustees of Maryland Teachers and State Employees Supplemental Retirement Plans v. Life & Health Insurance Guaranty Corporation,* 335 Md. 176, 642 A.2d 856, (1994) the Board of Trustees of the Maryland Teachers & State Employees Supplemental Retirement Plans (Board) was responsible for supplemental compensation plans for state employees and teachers including a deferred compensation plan for state employees. The Board purchased two GICs[7] from Executive Life (Group Annuity Contract No. GA–GICO1209 and Group Annuity Contract No. GA–CG012443A) on two separate occasions in 1987. After the rehabilitation plan was approved, the Board realized that it would suffer a loss on the GICs. The Board sought a declaratory judgment that the GICs were " 'annuity contracts entitled to the benefits of' the [Life and Health Insurance Guaranty Corporation Act, Maryland Code (1957, 1994 Repl.Vol.), Art. 48A, §§ 520–537] the Guaranty Act." *Id.,* 642 A.2d at 858. The Board filed a motion for summary judgment asserting that the GICs were covered under the Guaranty Act. The Life and Health Insurance Guaranty Corporation (Corporation) filed a cross-motion for summary judgment asserting that the GICs were not "covered policies" under the Guaranty Act. The circuit court of Maryland entered summary judgment in favor of the Corporation and concluded that the GICs did not "satisfy the statutory requirements for an annuity contract." *Id.* at 858.

On appeal the Maryland Court of Appeals addressed the issue of whether the GICs were annuity contracts and therefore "covered policies" under the Guaranty Act. The Maryland Court of Appeals reviewed the Guaranty Act.[8] Section 521 of the Guaranty Act recited that the Act's purpose "is to protect residents who are policyowners, insureds, beneficiaries, annuitants, payees, and assignees of life insurance policies, health insurance policies, [and] annuity contracts ... against failure in the performance of contractual obligations due to the impairment of the insurer issuing these policies or con-

---

7. The term "GIC" is an acronym for "guaranteed investment contract" or "guaranteed interest contract."

8. The Guaranty Act is similar to the 1978 Act.

tracts." *Id.* at 858. Section 522(a) of the Guaranty Act listed an annuity contract as one type of contract in the Guaranty Act and Section 524(4) stated that an annuity contract was a "covered policy." The Maryland Court of Appeals also reviewed the provisions of the two GICs. The GICs permitted the trustee "to purchase an individual annuity contract for a participant before the retirement date", to "withdraw the annuity value required to purchase an annuity for a participant who retires", and to offer benefits to the participants that "include, as a minimum and at the participant's option, a participant's lifetime annuity, an annuity for the greater of a period certain and the participant's life, and a joint and survivor annuity." *Id.* at 860.

The Maryland Court of Appeals relied on the definition of the term "annuity" in Section 65 of the Md.Code (1951, 1956 Cum. Supp.), Art. 48A, § 149A(b) and determined that the GICs were annuities and therefore "covered policies" under the Guaranty Act. The Maryland Court of Appeals stated:

> Under the literal language of § 65 the GICs are contracts 'providing for' an annuity, because the GICs provide for options to obtain individual policies specifying life-contingent periodic payments.[9] Indeed, the chairperson of the [Life and Health Insurance Guaranty] Corporation acknowledged on deposition that an individual, deferred annuity policy which provides either for the payment of a stream of periodic

payments is no less an annuity if the insured should elect payment of the cash value at maturity.

*Id.* at 861. *Also see Minnesota Life and Health Insurance Guaranty Association v. Department of Commerce*, 400 N.W.2d 769 (Minn.Ct.App.1987) (the Minnesota Court of Appeals determined that Executive Life's contracts were "annuity contracts" under Minn.Stat. § 61B.03(3)).

■ In the present controversy, the Contracts satisfy the definition of an "annuity Contract." First, each application form accompanying the Contracts was identified as a "Group Annuity Contract." *See* Appendix Of Petitioners/Plaintiffs In Support Of Their Motion For Summary Judgment (Petitioners' Appendix) No. 1. Second, the Contracts define the term "annuitant" as "[t]he individual upon whose life the amount and duration of benefits depends." Petitioners' Appendix No. 8(A) at 4. Third, similar to the GICs in *Board of Trustees*, the Contracts also provide that the Trustee can withdraw the annuity value and purchase an individual annuity for a Plan participant.[10] Fourth, the participant's contractual right to the periodic payments does include his or her right to the principal fund. Finally, the Contracts provide the participant with an option to choose from three types of annuity benefit payments[11] in addition to determining periodic benefit payment amounts.[12] This coupled

9. The Maryland Court of Appeals determined that the withdrawal provisions of the GICs were life-contingent because Executive Life Insurance Company "could be called upon, whenever a participant died, to pay its pro rata share of that participant's account in the Plan." *Board of Trustees*, 642 A.2d at 861.

10. Pursuant to the Participant Provision contained in the Contracts the "Trustee may withdraw the annuity value required to purchase an annuity for a participant who retires." Petitioners' Appendix No. 8A, 8B, 8C and 8D at 6.

11. The Contracts provide:
Benefit Payment Options.
1. Life Annuity. Payments will be made as long as the Annuitant is alive.
2. Period Certain and Life. Payments will be made for a period elected by the Owner. If the Annuitant is alive at the end of the period certain, payments will be made until the Annuitant's death. If the Annuitant dies during

this period, payments will be made to the beneficiary for the remainder of the period.
3. Joint and Survivor Annuity. Payments will be made while either Annuitant is alive. Payments made to the Joint Annuitant after the death of the Annuitant may remain the same, or may be reduced by one third or one half.
Petitioner's Appendix No. 8A, 8B, 8C and 8D at 6.

12. The Contracts provide:
Benefit payment amounts will be determined at the time benefits are purchased, and will be based on guaranty tables. These tables are based on the 1971 group annuity mortality table, with 7% interest for 10 years and 6% thereafter, plus an expense charge equal to the gross rate plus any premium tax payable by the company. The company will provide sample annuity purchase rate tables upon request.
Petitioners' Appendix No. 8A, 8B, 8C and 8D at 6.

1203

with the Insurance Commissioner's approval of the Contracts as "annuity contracts" adequately establishes that the Contracts are "covered policies" under Section 4 of the 1978 Act, *formerly* 40 P.S. § 1804. Construction of a statute by those charged with its administration and execution is entitled to great weight and should not be disregarded unless clearly erroneous. *Spicer v. Department of Public Welfare,* 58 Pa.Cmwlth. 558, 428 A.2d 1008 (1981).

### Mellon Bank

■ Petitioners next contend that Mellon as Trustee of the Plans and legal owner of the Contracts is a "person" and a "resident" under the 1978 Act to whom contractual obligations are owned by PLHIGA.

Section 4 of the 1978 Act, *formerly* 40 P.S. § 1804, defines the term "resident" as "[a]ny person who resides in this Commonwealth at the time a member insurer is determined to be an impaired or insolvent insurer and to whom contractual obligations are owned." Section 4 of the 1978 Act also defines the term "person" as "[a]ny individual, *corporation,* partnership, association or voluntary organization." (Emphasis added.) Finally, Section 7 of the 1978 Act provides:

(c) Whenever a foreign or alien insurer is an insolvent insurer, the association shall, subject to the written approval of the commissioner:

(1) guarantee, assume, or reinsure, or cause to be guaranteed, assumed, or reinsured the covered policies of residents;

(2) assure payment of the contractual obligations of the insolvent insurer to residents; or

(3) provide such moneys, pledges, notes, guarantees, or other means as are necessary to discharge such duties.

*Formerly* 40 P.S. § 1807(c).

The record establishes that Mellon satisfies the definition of the terms "person" and "resident" under the 1978 Act. Also, the Contracts state that "[t]he Trustee of the Plan named in the application is the Owner of this contract at issue" and that "[t]he Owner may exercise every contract right and enjoy every contract privilege without the consent of any participant." Petitioners' Appendix, No. 8A, 8B, 8C and 8D at 7. Mellon is the "legal owner" of the Contracts as evidenced by Executive Life's rehabilitator.[13] *See also* The Trust Agreement between Mellon and UNISYS, Petitioners' Appendix 12 ("[t]rustee shall have any and all powers and duties concerning the ... property ... as if it were the absolute owner of the property...."). Therefore, PLHIGA is responsible for the contractual obligations of Executive Life, due to its insolvency, to Mellon.

### Ross

■ Petitioners contend that Ross and similarly situated Pennsylvania participants are also "residents" for purposes of the 1978 Act. As noted earlier the purpose of the 1978 Act is to protect policyholders, beneficiaries and annuitants of annuity contracts against the failure of an insurer to perform its contractual obligations because of insolvency. Ross and the resident participants resided in Pennsylvania prior to Executive Life's insolvency. Mellon, as Trustee, is in charge of the proceeds of the Contracts and holds those proceeds in trust for the exclusive benefit of the resident participants under the Plans.[14] Ross and the resident par-

13. In a letter from Phil Giordano to Charles A. Service, Mr. Giordano stated that "[a]ccording to our records, Mellon Bank (as stated in my letter dated April 5, 1991) continues to be recognized by Executive Life Insurance Company as Master Trustee of the above referenced Plan/GICs. Thus, as Master Trustee, Mellon Bank is recognized as the Legal Owner...." Letter, dated December 3, 1992, Petitioners' Appendix No. 11.

14. Section 401(a) of the Internal Revenue Code, 26 U.S.C. § 401(a) provides that a "[a] trust created or organized ... and forming part of a ... pension ... of an employer for the exclusive

benefit of a his employee or their beneficiaries shall constitute a qualified trust...." Section 403(a) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1103(a) provides that "all assets of an employee benefit plan shall be held in trust by one or more trustees." Section 403(c) of ERISA, 29 U.S.C. § 1103(c) provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries...."

ticipants are the equitable owners of the Contracts which are held in trust for their benefit. Ross and the resident participants meet the statutory requirements of Section 7(c) of the 1978 Act, *formerly* 40 P.S. § 1807(c).

### Non–Residents

█ UNISYS further contends that non-resident participants satisfy the Pennsylvania residency requirement because of Mellon's residency. We disagree. As noted earlier if resident participants are eligible for coverage under Section 7(c) of the Act, it is disingenuous for UNISYS to argue that non-resident participants are also eligible for coverage under the express language of the same section. Such an interpretation disregards the residency limitation of the 1978 Act and would result in an absurd application of Section 7(c). "In attempting to ascertain the meaning of a statute, we are required to consider the intent of the legislature and are permitted to examine the practical consequences of a particular interpretation." *Commonwealth v. Kowalek*, 436 Pa.Superior Ct. 361, 367, 647 A.2d 948, 951 (1994). The 1978 Act defines "resident" as any person residing in the Commonwealth. It was not the legislature's intent to apply the assessments from insurance companies based upon business written in the Commonwealth to benefit non-resident participants under the Contracts based upon the residency of Mellon.

### Statutory Coverage Limits

█ Lastly, Petitioners contend that PLHIGA's statutory coverage limits of $100,000 for cash values and $300,000 in benefits with "respect to any one life" applies to each resident participant or beneficiary. To the contrary PLHIGA contends that if the Contracts are "covered contracts" under the 1978 Act its statutory coverage limit of $300,000 is payable with respect to only one life, Mellon, as the legal owner of the Contracts.[15]

Section 7(j) of the 1978 Act, *formerly* 40 P.S. § 1807(j) provides:

> The contractual obligations of the insolvent insurer for which the association becomes or may become liable shall be in excess of $100 and shall be as great as but no greater than the contractual obligations of the insolvent insurer would have been in the absence of an insolvency unless such obligations are reduced as permitted by subsection (d), but the aggregate liability of the association *on any one life* shall not exceed $100,000 with respect to the payment of cash values, or $300,000 for all benefits. This dollar limitation shall include all benefits which become payable after the date of the insolvency and all benefits that may be accrued and unpaid on the date of the insolvency (emphasis added).

In the present controversy, a reading of the 1978 Act clearly indicates that the legislative intent was to apply the term any one life to each policyholder, insured, beneficiary and annuitant. To interpret the term as applying only to Mellon, a Corporate Trustee, would be contrary to the principles of statutory construction and render meaningless the purpose of the 1978 Act which is to protect Pennsylvania residents from insurer insolvencies.

Accordingly, we enter summary judgment in favor of Petitioners as to Count One and Count Two of the amended complaint and hold that the Contracts are annuities and are

---

**15.** Section 8 of the 1978 Act, *formerly* 40 P.S. § 1808 provides:

(a) For the purpose of providing funds necessary to carry out the powers and duties of the association, the board of directors shall assess the member insurers, separately for each amount, at such time and for such amounts as the board finds necessary.

(b) There shall be three classes of assessments:

. . . .

(3) Class C assessments shall be made to the extent necessary to carry out the powers and duties of the association under section 7 with regard to an insolvent foreign or alien insurer.

. . . .

(c)(3) Class C assessments against member insurers for each account shall be in the proportion that the premiums received on business in this Commonwealth by each assessed member insurer on covered policies under each account for the last calendar year preceding the assessment bear to such premiums received on business in this Commonwealth for such calendar year preceding the assessment by all assessed member insurers.

"covered policies" under the 1978 Act and that PLHIGA must guarantee, assume or reinsure Executive Life's contractual obligations to each resident participant up to the statutory coverage limits of $100,000 for cash value or $300,000 for total benefits. Summary Judgment is denied as to Count Three of the amended complaint as we find PLHIGA has no contractual obligation under the Contracts to provide benefits to non-resident participants.

### ORDER

AND NOW, to wit, this 14th day of November, 1995, Petitioners' motion for summary judgment is granted as to Count One and Count Two of the amended complaint and denied as to Count Three of the amended complaint. Executive Life's contracts are annuity contracts and are "covered" under the 1978 Act. The Pennsylvania Life & Health Insurance Guaranty Association shall guarantee, assume or reinsure Executive Life's contractual obligations up to the statutory coverage limits for each resident participant.

### ORDER

PER CURIAM.

NOW, December 14, 1995, upon consideration of the "motion of plaintiffs/petitioners Unisys Corp., Raymond W. Ross, Jr., and Mellon Bank, N.A., and defendant/respondent Pennsylvania Life and Health Insurance Guaranty Association for clarification or, in the alternative, reargument with respect to this Court's November 14, 1995 order, and to further amend the order to include an express determination of finality," it is ordered as follows:

1. The motion for clarification or, in the alternative, reargument with respect to this Court's November 14, 1995, order is denied.

2. The motion to further amend the order is granted. Pursuant to Pa. R.A.P. 341(c), this Court expressly determines that an immediate appeal would facilitate resolution of the entire case.