Donna D. BENNETT, as Commissioner of Insurance of the Indiana Department of Insurance, Haynes International, Inc., Inland Container Corporation, NBD Bank, N.A. f/k/a INB National Bank, and Steven L. Householder, Appellants–Respondents,

v.

INDIANA LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION, Appellee–Petitioner.

No. 49A04–9605–CV–168.

Court of Appeals of Indiana.

Oct. 21, 1997.

---

Jeffrey A. Modisett, Attorney General, Terry G. Duga, Deputy Attorney General, Indianapolis, Thomas J. Trauring, Fell, McGarvey, Trauring & Wilson, Kokomo, Julia Blackwell Gelinas, David E. Jose, Sandra Boyd Williams, Locke Reynolds Boyd & Weisell, Indianapolis, for Appellants–Respondents.

Eric R. Johnson, Gordon L. Pittenger, Gayle A. Reindl, Sommer & Barnard, Indianapolis, for Appellee–Petitioner.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Respondents–Appellants Donna D. Bennett, as Commissioner of Insurance (the "Commissioner"), Haynes International, Inc. ("Haynes"), Inland Container Corporation ("Inland"), NBD Bank, N.A. f/k/a Indiana National Bank ("INB"), and Steven L. Householder ("Householder") appeal the trial court's vacation of the Commissioner's order in their favor. The trial court's judgment is in favor of Petitioner–Appellee Indiana Life and Health Insurance Guaranty Association ("the Association").

We reverse and remand.

### ISSUES

We find the following issues to be dispositive:

1. Whether the trial court erred in finding that Inland and Haynes, as employers and plan sponsors of a defined contribution profit-sharing and savings plan, do not have standing to seek statutory reimbursement for the employee-plan participants of the respective plans.

2. Whether the trial court erred in finding that the "contractual obligations" referred to in Ind.Code 27–8–8–5(c)(2) were not owed to resident plan participants.

3. Whether the trial court erred in finding that the measuring "life" under Ind.Code 27–8–8–5(c) refers to the life of the contract holder rather than the life of each plan participant.

4. Whether the trial court erred in finding that the Commissioner's order was preempted by the Employee Retirement Income Security Act of 1974 (ERISA).

5. Whether the trial court erred in finding that Haynes's decision to opt-out of an enhancement agreement rendered this action moot.

### FACTS AND PROCEDURAL HISTORY

Inland, a manufacturer of container board and corrugated packaging, has a container board mill in Newport, box plants in Crawfordsville and Evansville, and corporate headquarters and a preprint facility in Indianapolis. Haynes, a specialty metal manufacturer, has its principal place of business in Kokomo. Both Inland and Haynes sponsor savings and pension plans (the "Inland Plan" and "Haynes Plan," respectively) for eligible employees/plan participants ("participants"). These plans are defined contribution plans that qualify for tax deferral under Sections 401(a) and 401(k) of the Internal Revenue Code, and their primary purpose is to provide participants with a convenient, tax-deferred means to save for retirement.

Although some details of the two plans differ, each provides that participants may have a portion of their compensation contributed to a trust fund to which the employer/sponsor may make matching contributions. Participants are then entitled to certain retirement and other benefits as provided in the respective plan documents, and they may withdraw money from the trust fund under specified circumstances, including termination of employment prior to retirement.

A participant may direct that his contributions be invested in one of several "funds," including a fixed income fund. The Inland Plan Administrator and the Haynes Plan's trustee or investment manager select the specific investments to be purchased with plan funds. The administrators of each plan maintain a record of each participant's individual account in the respective plans, which shows the dollar value of each participant's undivided interest in the assets held by the plan's funds. Each participant is periodically provided with a report showing these values.

From time to time, INB, as trustee for the Inland Plan, and State Street, as trustee of the Haynes Plan, purchased guaranteed investment contracts ("GICs") from various insurance companies as investments for the fixed income funds of the respective plans. A GIC is a contract issued by an insurance company pursuant to which a single deposit or series of deposits is held at a specified rate of interest for a specified period. Under a GIC, the plan trustee makes the deposit and is designated as the "contract holder" or "owner." A GIC contract allows withdrawals of funds to provide retirement benefits to participants and contains annuity provisions in the event a participant wishes to receive benefits in the form of an annuity.

In January of 1988, INB, as trustee for the Inland Plan, purchased a guaranteed investment contract (the "Inland GIC") from Executive Life Insurance Company ("Executive"). On May 10, 1988 and December 20, 1988, State Street, as trustee of the Haynes Plan, purchased GICs (collectively, the "Haynes GIC") from Executive.

Executive was a California-based company. On April 11, 1991, the California Commissioner was appointed conservator of Executive. On December 6, 1991, a California court issued an order declaring Executive insolvent.

After the declaration of Executive's insolvency, Inland and Haynes requested that the Association advise them of its position with regard to coverage under the "Indiana Life and Health Insurance Guaranty Association Law" (the "Guaranty Act" or the "Act") found at Ind.Code 27–8–8–1 et seq. The applicable version of the Guaranty Act pertains to annuity policies and annuity contracts issued by entities licensed to transact the business of insurance in Indiana. Ind. Code 27–8–8–1(a). The Act establishes the Association as a nonprofit legal entity and requires all insurers doing business in Indiana to be a member thereof. Ind.Code 27–8–8–3. In the event that a foreign insurer becomes insolvent, the Act requires the Association to (1) "guarantee, assume, or reinsure or caused to be guaranteed, assumed, or reinsured the covered policies of residents," and (2) "assure payment of the contractual obligations of the insolvent insurer to residents." Ind.Code 27–8–8–5(c)(1) and (2). The Act provides that the "aggregate liability of the [A]ssociation is not to exceed one hundred thousand dollars ($100,-000) in cash values, or three hundred thousand dollars ($300,000) for all benefits, including cash values, with respect to any one (1) life." Ind.Code 27–8–8–5(*l*). Under the Act, the Association obtains the funds to meet its guarantee obligations by assessing its members based on their Indiana premiums. Ind.Code 27–8–8–6.

In response to Inland, the Association stated that the Inland GIC was a "covered policy" under the Act. The Association further stated that the "owner" of the Inland GIC was the resident trustee, and not the Inland Plan participants. Accordingly, the Association asserted that its obligation under the Act ran only to the trustee and only up to an aggregate liability of $100,000 in cash values or $300,000 for all benefits. In response to Haynes, the Association denied any obligation with regard to the Haynes GIC because the GIC was "owned" by a trustee which was not an Indiana resident.

Inland and Haynes requested a hearing with John F. Mortell, then Commissioner of Insurance, to determine the Association's duties under the Act. INB and Householder moved to intervene and to have Inland appointed as their representative. The motion was granted. A stipulation of facts was entered and all parties filed motions for summary judgment. On February 19, 1994, the Commissioner issued a "Memorandum of Decision, Findings of Fact, Conclusions of Law, and Order" granting the summary judgment motions filed by Inland, INB, Householder, and Haynes, and denying the motion filed by the Association.

In issuing his order, the Commissioner reasoned that "[t]he purpose of Ind.Code 27–8–8–5(c) is to preserve the insurance coverage of Indiana residents under insurance contracts of an insolvent insurer, up to a statutory limit per life, just as the coverage would have continued had the insurer not become insolvent." Commissioner's Memorandum of Decision, Findings of Fact, Conclusions of Law, and Order at 4. The Commissioner concluded that:

1. Inland, Haynes, INB, and Householder had standing to pursue this matter.

2. The Inland GIC and the Haynes GIC are covered policies within the meaning of Ind.Code 27–8–8–1 and Ind.Code 27–8–8–2.

3. The trustees of the Inland and Haynes plans are the representatives of, and owe a fiduciary duty to, each individual participant in the plans.

4. Executive's obligations to the trustees under the GICs are obligations through the trustees, to each individual participant in the plans.

5. Ind.Code 27–8–8–5 requires that the Association cover, up to the aggregate limit of $100,000 per life, each of the participants in the Inland Plan and the Haynes Plan, who on the date of entry of the order of liquidation of Executive, resided in Indiana and had an interest in a part of the Inland Plan or Haynes Plan invested in the Executive GICs.

6. By refusing to cover, up to the limits contained in Ind.Code 27–8–8–5(*l*), each individual participant's proportionate interest in each part of the Inland Plan and Haynes Plan invested in Executive GICs, the Association has failed to act within the meaning of Ind.Code 27–8–8–5.

*Id.* at 22–24.[1] The Commissioner ordered the Association to cover, up to the aggregate limit of $100,000, "each individual participant in the Haynes Plan and Inland Plan who, on the date of entry of the order of liquidation of [Executive], resided in Indiana and had an interest in a portion of the Haynes Plan or the Inland Plan invested in the [Executive] GICs." *Id.* at 25. The Commissioner also ordered this coverage to be to the "full extent of the proportionate interest of each individual participant in each part of the Haynes Plan or the Inland Plan that is invested in an [Executive] GIC." *Id.* The Commissioner further ordered that the Association should cover, up to the aggregate limit of $100,000, "each resident of Indiana who is similarly situated, regarding [Executive] GICs, to the participants in the Haynes Plan or the Inland Plan." *Id.*

On March 11, 1994, the Association filed a petition for judicial review of the Commissioner's order. The trial court heard oral argument on the petition and reversed the Commissioner's order. The trial court concluded, among other things, that: (1) Inland and Haynes did not have standing to participate in the administrative proceeding before the Commissioner or in the court proceedings; (2) INB had standing as a resident trustee, but State Street did not have standing as a nonresident trustee; (3) Executive's obligation, and that of the Association under the Guaranty Act, ran only to resident trustees, not to resident participants; (4) the Association had no obligation to the Haynes Plan; (5) the measuring "life" under Ind. Code 27–8–8–5(*l*) is the "life" of the contract holder, and the appropriate coverage is $100,000; (6) the Commissioner's order was preempted by ERISA and is "unenforceable, null, and void;" and (7) the issue of coverage as to the Haynes Plan was rendered moot by the Plan's decision to opt out of an enhance-

1. For the sake of brevity, the findings are renumbered and restated.

ment agreement. Trial Court's Findings of Fact, Conclusions of Law, and Judgment at 1–6. The trial court further concluded that the Commissioner's order "is arbitrary, capricious, and an abuse of the Commissioner's discretion; is otherwise not in accordance with law; is in excess of the Commissioner's statutory jurisdiction, authority, and limitations; is short of statutory right; and is unsupported by substantial evidence." *Id.* at 7. Accordingly, the trial court vacated the Commissioner's order with instructions to dismiss the administrative proceedings as to Inland, INB, Householder, the Inland GIC, Inland GIC participants, Haynes, the Haynes GICs, Haynes GIC participants, and "each resident of Indiana who is similarly situated." *Id.* at 7–8.

Inland, INB, Householder, and Haynes now appeal the trial court's judgment.

### DISCUSSION AND DECISION
### STANDARD OF REVIEW

Judicial review of agency decisions is governed by Ind.Code 4–21.5–1–1 et seq. When a trial court reviews an agency's decision, the court is bound by the agency's findings of fact that are supported by the record. *Indiana Civil Rights Commission v. Southern Indiana Gas & Electric Co.*, 648 N.E.2d 674, 679 (Ind.Ct.App.1995), *trans. denied.* An agency's determination of questions of law is not accorded the same type of deference. *Natural Resources Commission v. AMAX Coal Co.*, 638 N.E.2d 418, 423 (Ind. 1994). "A reviewing court is not bound by an agency's interpretation of law and is free to determine any legal question which arises out of an administrative action." *Southern Indiana*, 648 N.E.2d at 679. This is true because "[l]aw is the province of both the agency and the judiciary." *Id.* A legal conclusion shall be set aside if it is "not in accordance with law." Ind.Code 4–21.5–5–14(d).

### I. STANDING

Inland and Haynes contend that the Commissioner was correct in ruling that they had standing to participate in the administrative hearing process. The doctrine of standing focuses on whether the complaining party is

the proper party to invoke the trier of fact's jurisdiction. *Shourek v. Stirling*, 621 N.E.2d 1107, 1109 (Ind.1993). The doctrine operates as a restraint on the exercise of jurisdiction in that the trier of fact cannot proceed where there is no demonstrable injury to the complaining party. *Board of Trustees of the Town (Now City) of New Haven v. City of Fort Wayne*, 268 Ind. 415, 375 N.E.2d 1112, 1117 (1978) (quoting *City of Indianapolis v. Indiana State Board of Tax Commissioners*, 261 Ind. 635, 308 N.E.2d 868, 870 (1974)). The standing requirement assures that a claim will be actively and vigorously pursued. *Darlage v. Drummond*, 576 N.E.2d 1303, 1308 (Ind.App.1991).

Under ERISA, any entity which has the ability to "exercise any discretionary authority or discretionary control respecting management of [an employee benefit plan]" is a "fiduciary." *U.S. Steel Corp. v. Commonwealth of Pa. Human Relations Commission*, 669 F.2d 124, 126 (3rd Cir.1982) (quoting 29 U.S.C. § 1002(21)(A)). A fiduciary has standing to bring an action in federal court to enforce ERISA provisions. *Ed Miniat, Inc. v. Globe Life Insurance Group, Inc.*, 805 F.2d 732, 735 (7th Cir.1986), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987); *U.S. Steel*, 669 F.2d at 126. Furthermore, a fiduciary has a duty to safeguard the assets of an ERISA plan and may be sued by plan participants for breach of that duty. *Kurz v. Philadelphia Electric Co.*, 96 F.3d 1544 (3rd Cir.1996).

The record in this case indicates that Inland and Haynes, as employer sponsors of the respective plans, retain the ability to (1) exercise discretion and control over the plans, (2) alter the terms of the plans, (3) remove the plan trustees, and (4) establish the amount of employee contributions. Inland and Haynes are fiduciaries, and they have a duty to safeguard the assets of the respective plans. This duty to the respective plans places Inland and Haynes at financial risk if assets of the plans are dissipated because of breach of their fiduciary duty. At the time that Inland and Haynes challenged the Association's interpretation of the Guaranty Act before the Commissioner, Inland and Haynes were at risk of lawsuits by plan

participants.[2] Thus, both Inland and Haynes had an interest in the Commissioner's ruling. We find that Inland and Haynes had standing to participate in the administrative process and any subsequent challenges to the Commissioner's ruling arising out of that process.[3]

The Association acknowledges that Inland and Haynes are fiduciaries of the respective plans. However, the Association contends that Inland and Haynes lack standing because they are not the owners, purchasers, contract holders, policyholders, insureds, contracting parties, or beneficiaries with regard to the Executive GICs. The Association fails to place the proper significance upon the duty arising from Inland and Haynes's fiduciary status. It ignores the fact that the GICs were plan assets which Inland and Haynes had a duty to safeguard.

## II. CONTRACTUAL OBLIGATIONS

Ind.Code 27–8–8–5(c)(2) provides that the Association shall "assure payment of the contractual obligations of the insolvent insurer to residents." Haynes contends that the Commissioner was correct in determining that "[Executive's] obligations to the trustees under the GICs are obligations, through the trustees, to each individual participant in the plans." Commissioner's Memorandum of Decision, Findings of Fact, Conclusions of Law, and Order at 24. The Association counters that the trial court was correct in determining that Executive was obligated only to resident trustees, not to nonresident trustees like State Street.

The argument made by Association, and accepted by the trial court, was made to, and rejected by, the courts of two other states. In *Unisys Corp. v. Pa. Life & Health Insurance Guaranty Association,* 667 A.2d 1199 (Pa.Cmwlth Ct.1995), *aff'd by,* 546 Pa. 256, 684 A.2d 546 (1996), the court was requested to interpret a provision of the Pennsylvania

Act which duplicates Ind.Code 27–8–8–5(c)(2). The court noted that the purpose of the Act was "to protect policyholders, beneficiaries and annuitants of annuity contracts against the failure of an insurer to perform its contractual obligations because of insolvency." *Id.* at 1204. The court concluded that the trustee held the GIC proceeds in trust for the exclusive benefit of the resident participants in defined contribution plans. *Id.* The court further concluded that the resident participants were the equitable owners of the GICs which were held in trust for their benefit. *Id.* at 1204–05. The court held that the plan participants were "residents" under the statute. *Id.* at 1205.

In *Arizona Life & Disability Insurance Guaranty Fund v. Honeywell, Inc.,* 190 Ariz. 84, ——, 945 P.2d 805, 817 (1997), the Arizona Supreme Court interpreted a provision of its guaranty act providing for Fund protection of contracts "issued to residents of this state by persons authorized to transact insurance in this state...." The court, which was requested to find that the statute restricted Fund coverage to only resident trustees, held that "Arizona resident plan participants were the equitable owners of the GICs and that for the purposes of Arizona's guaranty act, the GICs were "issued to" such equitable owners." *Id.* In so holding, the court stated that

[i]t would be possible under the Fund's construction for employees who are residents of other states to invoke the protection of Arizona's fund merely because an Arizona resident was trustee of their retirement plan. That would expose the Fund to coverage of benefits owed to unknown numbers of non-Arizonans, based merely on the selection of an Arizonan as trustee. On the other hand, the Fund's interpretation would deny coverage to Arizona employees merely because their trustee was not a resident of this State.

---

**2.** We note that from a desire to assist plan participants and/or to avoid a lengthy and bitter legal battle with plan participants, Inland made a loan to the Inland Plan. We do not find that this loan prevented the filing of a suit by the plan participants. Thus, Inland had a justiciable interest in the outcome of the administrative hearing.

**3.** It is irrelevant that a suit by the plan participants is now barred by the applicable statute of limitations. *See* 29 U.S.C. § 1113 (stating that plan participants retain the right to bring an action for a period of six years, or a period of three years if the plan participants obtain actual knowledge of a breach of fiduciary duty).

*Id.* at —– - ——, 945 P.2d at 816–17 (quoting *Arizona Life & Disability Insurance Guaranty Fund v. Honeywell, Inc.,* 187 Ariz. 146, 150, 927 P.2d 806, 810 (App.1996)). The court concluded that the Fund's argument was "patently and unnecessarily contrary" to the purposes of the guaranty act. *Id.*

■ We agree with both the *Unisys* and *Honeywell* courts that the trustee of a plan holds the proceeds of the plan in trust for the exclusive benefit of the plan participants. Thus, the plan participants are the beneficial or equitable owners of the contracts held in trust for their benefit, and resident plan participants are "residents" to whom contractual obligations are owed under Ind.Code 27–8–8–5(c)(2).

Although our legislature has not explicitly stated the purpose of the Guaranty Act, the drafters of the 1975 National Association of Commissioners' (NAIC) Model Act which formed the basis for our Act, have done so. In the Official Comments to the 1975 Model Act, the drafters state that the basic purpose of a guaranty fund "is to protect policyowners, insureds, beneficiaries, annuitant payees, and assignees against losses which might otherwise occur due to an impairment or insolvency of an insurer." Interpreting Ind.Code 27–8–8–5(c)(2) in the manner requested by the Association would be contrary to the statute's purpose.

The Association contends that the trial court was correct in rejecting the Commissioner's order because the order is contradicted by (1) the language of the GICs themselves, (2) principles of trust law, and (3) principles of law pertaining to third party beneficiaries. We find that the propriety or impropriety of the Commissioner's order is not determined by an examination of the common law, but by an examination of the purpose and language of the Guaranty Act.

■ The Association further contends that we should adopt the reasoning of *Honeywell, Inc. v. Minnesota Life & Health Insurance Guaranty Association,* 518 N.W.2d 557 (Minn.1994) (*Honeywell II* ), and *Bennet v. Virginia Life, Accident, & Sickness Insurance Guaranty Association,* 251 Va. 382, 468 S.E.2d 910 (1996). These cases state that resident plan participants may not receive

protection under a guaranty act if GIC proceeds are "owned" by a non-resident trustee.

In *Honeywell II,* the court stated that "[w]e simply observe that in the context of an unallocated annuity contract [GIC], it is ordinarily understood that the 'owner' is the contract holder, not the individual plan participants who are the ultimate beneficiaries of the contract." 518 N.W.2d at 561, n. 9. The court did not decide the issue of whether the guaranty act contemplated coverage to the ultimate beneficiaries. We do not find the *Honeywell II* "observation" to be persuasive.

In *Bennet,* the court interpreted a Virginia statute which excluded guaranty act coverage from "any contract or certificate which is not both *issued to* and *owned by* an individual." 468 S.E.2d at 913 (emphasis in original). We decline the invitation to read the restrictions of the Virginia statute into Ind.Code 27–8–8–5(c)(2).

## III. "LIFE" AS USED IN IND. CODE 27–8–8–5(*l*)

■ Ind.Code 27–8–8–5(*l*) limits the Association's aggregate liability to "one hundred thousand ($100,000) in cash values, or three hundred thousand ($300,000) for all benefits, including cash values, with respect to any one (1) life." The term "life," as used in the last phrase of the statute, may be interpreted to refer to only two entities-individual plan participants or the contract holder. The Commissioner determined that the term referred to each plan participant; the trial court determined that the term referred to the contract holder.

As we stated above, the Guaranty Act is intended to assure the payment of contractual obligations of the insolvent insurer that are owed to resident plan participants. The death of any individual plan participant triggers an early payout of GIC proceeds under the plans, while the termination of the "life" of the trustee has no effect upon GIC coverage. The individual plan participant, not the trustee, bears the loss caused by an insolvency. The only "life" with any meaningful connection to the GIC is the life of each plan participant. There is no rational basis for interpreting the word "life," as used in Ind.

Code 27–8–8–5(*l*), to measure recovery by the "life" of the trustee. As the court noted in *Unisys,* "[t]o interpret the term as applying only to [the trustee] would be contrary to the principles of statutory construction and render meaningless the purpose of the [Act]. . . ." 667 A.2d at 1205.

In 1995, the legislature amended Ind.Code 27–8–8–5(*l*). The amended statute provides that:

> However, the aggregate liability of the association with respect to covered policies *other than unallocated annuity contracts* is not to exceed one hundred thousand dollars ($100,000) for all benefits, including cash values, with respect to any one (1) life. *The aggregate liability of the association with respect to covered unallocated annuity contracts shall not exceed five million dollars ($5,000,000) for all benefits, including cash values, with respect to any one (1)* **contract holder,** *irrespective of the number of unallocated annuity contracts held by the contract holder.*

(Emphasis supplied).

█ The Association contends that the amendment was a clarification of the former provision. However, the rules of statutory construction do not support the Association's contention. A fundamental rule of statutory construction is that an amendment changing a prior statute indicates a legislative intention that the meaning of the prior statute has changed. Such an amendment raises a presumption that the legislature intended to change the law unless it clearly appears that the amendment was passed in order to express the original intention more clearly. *Indiana Alcoholic Beverage Commission v. Osco Drug, Inc.,* 431 N.E.2d 823, 833 (Ind.Ct. App.1982). The 1995 change to the "contract holder" as the measuring unit would indicate that the prior statute's reference to "any one life" was to the life of each plan participant. There is nothing to indicate that the 1995 amendment to the statute was made only to more clearly express the original intention of the legislature.

The Association's contention is also weakened by an examination of the history of the NAIC Model Act as it applies to our statute. As noted above, our Guaranty Act is prem- ised upon the 1975 NAIC Model Act. In 1985, after much debate about coverage of GICs, the NAIC changed its Model Act to limit coverage to $5,000,000 with respect to any one contract holder. Indiana did not adopt the NAIC changes until 1995. As Inland states in its reply brief:

> What [the Association] is requesting this Court to do is what the Indiana General Assembly chose not to do. [The Association] wants this Court to amend the earlier Act to provide for unallocated annuity coverage on a per contract holder basis, but without the accompanying $5,000,000 increased limits provided by both the Model Act and the amended Indiana Act. The Indiana Commissioner of Insurance was correct in refusing to do so.

Inland Reply Brief at 17.

The Association further contends that measuring its coverage by the "life" of each plan participant would lead to administrative difficulties as the identities of plan participants are not "readily identifiable." Appellee's Brief at 53–54. We disagree. The identities of the plan participants at the time Executive became insolvent are fixed and the list of plan participants have been or can be provided to the Association by the respective plans.

## IV. ERISA PREEMPTION

Inland and Haynes contend that the trial court erred in determining that the Commissioner's order was preempted by ERISA. ERISA establishes a detailed federal framework for the regulation of pension and welfare benefit plans. Consistent with its intent to achieve uniformity in the laws applicable to such plans, Congress enacted a provision providing that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan. . . ." 29 U.S.C. § 1144(a). The term "State laws" includes all "laws, decisions, rules, regulations, or other State actions having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). However, ERISA provides a "savings clause" which reserves state authority to regulate "insurance." 29 U.S.C. § 1144(b)(2)(A).

■ Haynes contends that the Association waived the preemption issue because it did not present the issue to the Commissioner. Haynes's contention is misplaced, as it is the Commissioner's order interpreting the Guaranty Act, and not the Guaranty Act itself, which is the subject of the Association's preemption argument. The Association could not raise the issue of preemption of the Commissioner's order before the order was made.

Inland and Haynes contend that the Association lacks· standing to raise the issue of preemption. They argue that because the Association is not a party permitted to bring a civil action under ERISA [4], it is not permitted to raise the issue of preemption of a State law. They further argue that the Association is not within ERISA's "zone of interest" as an entity protected by ERISA.

In making their initial argument, Inland and Haynes rely upon *Curtis v. Nevada Bonding Corp.,* 53 F.3d 1023 (9th Cir.1995), and *Harris v. Provident Life and Accident Insurance Co.,* 26 F.3d 930 (9th Cir.1994). These cases deal with the propriety of a defendant's claim of preemption after a finding that the plaintiff had no standing to bring an ERISA civil action. They are inapposite to the relationships of the parties in the present case.

■ In reviewing Inland and Haynes's second argument, we must determine whether the Association would suffer injury through the enforcement of the Commissioner's order and whether the Association falls within ERISA's zone of interest. *See CIGNA Healthplan of La., Inc. v. State, ex rel. Ieyoub,* 883 F.Supp. 94, 101–102 (M.D.La. 1995), *aff'd,* 82 F.3d 642 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 387, 136 L.Ed.2d 304. In making this determination, we must ascertain whether (1) the Association suffered an actual injury, (2) there is a causal connection between the injury and the conduct complained of, and (3) the injury would "likely" be "redressed by a favorable decision." *Id.* The burden is on the Association to establish the existence of these three

elements. *Id.* Given the fact that the Association does not attempt to establish these elements, we cannot conclude that it has "zone of interest" standing to raise the issue of ERISA preemption.

Even if the Association had established standing to raise the issue of preemption, it still would not prevail in showing that the trial court's finding of preemption was correct. In examining the trial court's ruling, we will assume, without deciding, that the Commissioner's order "relates to" the ERISA plans at issue. Our next step is to determine whether the order is saved from preemption because it is a state law which regulates insurance.

■ In determining whether the Commissioner's order regulates insurance and therefore is not preempted under § 1144(a), we must utilize a two-part test. *See Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 48, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987). First, we must determine whether the Commissioner's order fits the "common sense" definition of insurance regulation. Second, we must test this determination by reference to three criteria utilized in interpreting the phrase "business of insurance" under the McCarran–Ferguson Act. We must determine whether the law (1) has the effect of transferring or spreading a policyholder's risk, (2) is an integral part of the policy relationship between the insurer and the insured, and (3) is limited to entities within the insurance industry. *Id.*

A State law meets the "common sense" view of the word "regulates" if it not only has an impact on the insurance industry, but also is specifically directed toward the industry. *Pilot Life,* 481 U.S. at 49–51, 107 S.Ct. at 1554.· As stated above, the purpose of the Guaranty Act is "to protect policy-owners, insureds, beneficiaries, annuitant payees, and assignees against losses which might otherwise occur due to an impairment or insolvency of an insurer." Accordingly, the Act requires the Association, a group of insurers, to assure the contractual obligations of an insol-

---

4. 29 U.S.C. § 1132 provides that civil actions to enforce ERISA may be brought by a "partici-

pant," "beneficiary," or "fiduciary."

vent insurer. The Commissioner's order seeks to accomplish the payment of those contractual obligations, and as such, the order regulates insurance. From a "common sense" point of view, the Commissioner's order is specifically directed toward the insurance industry. It therefore regulates insurance.

The conclusion drawn from an application of the "common sense" point of view is bolstered by our examination of the three criteria delineated in the McCarran–Ferguson Act. First, the Act and the Commissioner's order have the effect of transferring the trustee policyholder's risk, and the equitable risks of the plan participants, from the insolvent insurer to the Association. Second, the Act and the Commissioner's order, in assuring the payment of the contractual obligations of the insolvent insurer by the Association, are an integral part of the policy relationship between the insurer and the insureds. Third, the Act and the Commissioner's order is limited to the entities within the insurance industry—the insurers, the association of insurers, and the actual and equitable policy holders.

The Association argues that the Commissioner's order fails the test because it runs "roughshod" over the insurer-contract holder relationship by requiring the allocation of Plan assets contrary to the provisions of the Plan documents and ERISA. Appellant's Brief at 66–67. The order is directed to the Association, which is acting as an insurer. The order contemplates the payment of contractual obligations to the trustee; it does not require the trustee to do anything contrary to the Plan documents or ERISA.

## V. MOOTNESS

During the proceedings before the Commissioner, the Executive conservator entered into an enhancement agreement with the National Organization of Life and Health Insurance Guaranty Association and certain state guaranty organizations, including the Association. According to the Commissioner's findings, the rehabilitation plan for Executive provides for transfer of Executive's liquid assets and certain liabilities to Aurora National Life Assurance Company ("Aurora").

The plan also requires Aurora to assume Executive's contractual obligations, which were to be restructured. Pursuant to the plan, holders of Executive contracts received information on the restructured obligations and were given until February 12, 1994, to decide to either "opt into" or "opt out" of the rehabilitation plan. The Association took the position that it had no further legal obligation to those under its protection who opted out of the plan. The Commissioner declined to determine the effect of opting out of the plan. After the Commissioner's order was issued, Haynes did opt out. The issue of the effect of Haynes's decision was brought before the trial court, which concluded:

10. In the context of the administrative proceeding, former Commissioner Mortell expressly declined to decide whether [the Association] had any obligation to [Executive] contract holders that decided not to participate in the [Executive] Rehabilitation Plan.

11. Because the Haynes GICs "opted out" of the [Executive] Rehabilitation Plan, and the Commissioner expressly declined to decide whether [the Association] has any obligations to contract holders that "opted out," this case is moot as to Haynes and the Haynes GICs.

Trial Court Conclusions of Law at 2.

It is clear that neither the trial court nor the Commissioner decided whether the Association was correct in its determination that it had no obligation to Haynes after it opted out of the rehabilitation plan. Haynes now asks us to act as an administrative agency or trial court and decide whether "opting out" relieved the Association of any further obligations to Haynes. However, our function is not to make initial determinations as an agency or trial court. Our function is to review the decisions of such entities. The issue of the effect of opting out of the rehabilitation plan is left for another day and another forum.

## CONCLUSION

The trial court erred in finding that Inland and Haynes lacked standing to seek statutory payment under the Guaranty Act. The trial court also erred in finding that the

contractual obligations referred to in Ind. Code 27–8–8–5(c)(2) were not owed to resident plan participants, and that the phrase "any one (1) life" as it is used in 27–8–8–5(c) referred only to contract holders. The trial court further erred in finding that the Commissioner's order was preempted by ERISA.

We reverse and remand with instructions that the trial court vacate its judgment and reinstate the Commissioner's order.

Reversed and remanded.

CHEZEM and ROBERTSON, JJ., concur.