TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







ON MOTION FOR REHEARING









NO. 03-97-00210-CV







Messagephone, Inc.; MPI Pass-Through Annuity Collateral Trust;


and Donovan M. Campbell, M.D., Appellants



v.



Texas Life, Accident, Health & Hospital Service


Insurance Guaranty Association, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. 94-10134-A, HONORABLE PAUL R. DAVIS, JR., JUDGE PRESIDING







 To address certain issues raised in the motion for rehearing we withdraw our earlier opinion
and judgment issued February 26, 1998, and substitute this one in its place.

 At issue is whether certain unallocated annuities are covered under the Texas Life,
Accident, Health and Hospital Service Guaranty Act. (1) The annuity contracts were issued by American
Equitable Life Insurance Company to Messagephone, Inc. and later assigned to MPI Pass-Through
Annuity Collateral Trust and Donovan Campbell. After the insurance company declared insolvency,
appellants sought coverage on the contracts from appellee, the Texas Life, Accident, Health & Hospital
Service Insurance Guaranty Association (the "Association"), which denied the claims. Appellants then sued
the Association. The trial court denied appellants' motion and granted appellee's motion for summary
judgment. In two points of error, appellants claim the trial court erred in finding as a matter of law that their
claims are not covered under the Act. We will affirm the trial court's judgment.


BACKGROUND


The Nature of Unallocated Annuity Contracts

 The instant case involves guaranteed interest contracts (GICs) purchased as "unallocated
group annuity contract[s]." GICs have recently become a popular investment vehicle for employee benefit
plans, such as qualified retirement plans, and for this purpose are purchased as unallocated annuities by plan
managers because they provide a guaranteed rate of interest and a relatively risk-free return of the principal
at the end of the term. See Honeywell, Inc. v. Minnesota Life & Health Ins. Guar. Ass'n, 110 F. 3d
547, 549 (8th Cir.), cert. denied, 118 S. Ct. 156 (1997); Unisys Corp. v. Texas Life, Accident, Health
& Hosp. Serv. Ins. Guar. Ass'n, 943 S.W.2d 133, 138 (Tex. App.--Austin 1997, writ denied); see
generally Practicing Law Institute, Legal Issues in Pension Investment (1981) (including article on
guaranteed investment contracts). Generally, unallocated annuity contracts are issued to the qualified
retirement plan manager in trust for the employee plan so that employee contributions are managed by the
trustee on behalf of plan participants. E.g. Honeywell, Inc., 110 F. 3d at 549; Unisys Corp., 943 S.W.2d
at 135. In addition to a guaranteed return, an unallocated annuity contract provides the option for an
eligible plan participant to purchase an individual annuity at a guaranteed rate incorporating standard
mortality tables. When an individual exercises her option to purchase an annuity that contract is then
"allocated" to that participant; the guaranteed interest contract issued to the plan manager remains an
unallocated group annuity contract. 


The Nature of the Guaranty Association

 The Guaranty Act established the Association to protect persons against failure in the
performance of contractual obligations under certain forms of group and individual life, accident, and health
insurance policies and annuity contracts should the issuing insurance company become insolvent. Tex. Ins.
Code Ann. art. 21.28-D, §§ 2, 6 (West Supp. 1998). Holders of contracts or policies issued by an
insolvent insurer and covered under the Act may be entitled to coverage from the Association. Id. § 3. 


A History of these Transactions

 In the spring of 1989 Messagephone purchased three contracts from American Equitable. 
It paid for each of the contracts by issuing to the insurance company unrestricted shares of Messagephone's
common stock. American Equitable called each contract an unallocated group annuity, defined as an
"accumulation of deposits at interest with right to purchase annuity at guaranteed rates." Although the
insurance company called the three Messagephone contracts unallocated group annuities, they differed from
the standard guaranteed investment contract in two significant ways: (1) there was no initial cash deposit
which the insurance company could invest at presumably higher rates than it was paying on the contract (the
purchase price being stock rather than cash); and (2) the contracts were issued to a corporation rather than
to a qualified employee benefit plan. It is hard to imagine how the three contracts made economic sense
to American Equitable without an initial cash deposit; in order to generate any benefit for itself the insurance
company had to presume an increase in the value and marketability of Messagephone's stock that
exceeded the interest it promised to pay for five years. Normally, an insurance company relies on its own
ability to wisely invest the cash deposit in order to generate benefits beyond the interest payments. On their
face the contracts appeared to be risk free to Messagephone, as long as the insurance company maintained
financial integrity, or its obligations were backed by the Association. Significantly, American Equitable was
experiencing financial difficulties at the same time or soon after it issued these hybrid contracts to
Messagephone. More significantly, the purchase of the three annuity contracts was part of a
contemporaneous series of financial transactions by Messagephone that we will now outline. 

 The following transactions all occurred in 1989. On March 15, Messagephone created
the MPI Pass-Through Annuity Collateral Trust Agreement (the "Trust"), anticipating the Trust would own,
administer, collect and maintain certain annuity contracts issued to Messagephone. The Trust was designed
to hold annuities in an amount up to $410,000 for a term of five years. Joel Pugh and William Dean,
officers and majority stockholders of the company, were named Trustees. On March 16, Messagephone
purchased contract number 43 with a face value of $200,000 in exchange for 40,000 shares of stock (a
value of $5 per share). On March 17, Messagephone purchased contract number 44 with a face value
of $210,000 for 70,000 shares of its stock (the value had inexplicably diminished to $3 per share). 
American Equitable promised to pay twelve-percent interest semi-annually on the face value of both
contracts for a term of five years. Both annuity contracts were assigned by Messagephone to the Trust on
the day they were purchased. (2)

 As soon as the annuities had been assigned to the Trust, Messagephone signed a series of
non-recourse promissory notes, each called an "MPI Annuity Note," to various lenders. The terms of the
notes mirrored the terms of the annuity contract: twelve-percent interest, payable semi-annually, for a term
of five years, the principal due in full at maturity. The lenders then assigned the notes to the Trust in
exchange for an interest in the Trust based on the dollar amount of the notes. Thus, each note was secured
by the American Equitable annuity contracts issued to Messagephone. Each was a non-recourse note: the
lender agreed to look only to the annuities or the Trust rather than to Messagephone. Curiously each note
also provided that in the event of American Equitable's default on the payments, the lender might look to
the "Insurance Fund" of the State of Texas, presumably a reference to the Guaranty Association. (3) 
Messagephone then borrowed the following sums, executing "annuity notes":



 Date Amount Lender

 March 21 $ 25,000 First Interstate Bank

 April 7 100,000 BNA Partners

 April 19 45,000 BNA Partners

 April 28 55,000 BNA Partners

 May 10 30,000 BNA Partners

 June 13 5,000 BNA Partners 



 On May 9, Messagephone purchased contract number 49 with a face value of $150,000
in exchange for 20,000 shares of its stock (a value of $7.50 per share). On June 22, Messagephone
borrowed $150,000 from Donovan Campbell, M.D., issued him a promissory note with the same terms
as the other non-recourse "annuity notes," and assigned to Campbell its rights and interest in contract
number 49. (4) This financial transaction mirrored the earlier loans but assigned annuity number 49 directly
to the lender rather than going through the Trust. (5) 

 The Department of Insurance noted American Equitable's financial difficulties as early as
May 1989; it informed the company's management that the company was insolvent. The insurance
company paid the first semi-annual interest payments on contracts 43 and 44 in September 1989. 
American Equitable was placed in receivership in November 1989, and no further payments were made
on any of the three contracts. In June 1990, Messagephone filed a proof of claim for all three annuity
contracts in the receivership proceeding. The company indicated on its application that it alone had an
interest in the claim and was not assigning the benefits to any other. Although the Trust and Campbell never
filed a proof of claim, both declare they authorized Messagephone to file claims on their behalf. In
November 1992, the Association elected to take over the handling of all claims in the American Equitable
proceeding; in July 1994, the Association denied coverage on the three claims asserted by Messagephone.

 Shortly thereafter, Messagephone filed suit against the receiver and the Association; both
Messagephone and the Association filed motions for summary judgment. The Association relied on
affirmative defenses, specifically that the claims were excluded under sections (8) and (9) of article 21.28-D, section 3(c) of the Insurance Code. (6) Tex. Ins. Code Ann. art. 21.28-D, § 3(c)(8),(9) (West 1981 &
Supp. 1998). Due to the complex nature of the proceedings, the trial court appointed a special master. 
The master reviewed the transactions at issue and recommended granting summary judgment in favor of
the Association. After severing the suit against the receiver, the trial court granted the Association's motion
for summary judgment and denied Messagephone's. The court did not state the grounds upon which it
made its ruling. In two points of error, appellants claim the trial court erred in granting summary judgment
in favor of the Association and denying appellants' motion.


STANDARD OF REVIEW

 Generally upon review of a summary judgment, a court determines whether the movant has
shown that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex.
R. Civ. P. 166a(c); Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 548 (Tex. 1985). Here
both parties agree this case is appropriately decided by summary judgment. When both parties move for
summary judgment and the trial court grants one motion and denies the other the appellate court should
determine all questions presented. See Jones v. Strauss, 745 S.W.2d 898, 900 (Tex. 1988). In the
instant case, the only question presented is one of law: whether the appellants' claims regarding the three
contracts are covered under the Guaranty Act. When reviewing a summary judgment granted on general
or unstated grounds, we consider whether any theories set forth in the motion will support the summary
judgment. See State Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374, 380 (Tex. 1993). Thus, if any
of the grounds presented by the Association are meritorious, we must affirm the trial court's summary
judgment.


DISCUSSION

 As grounds for summary judgment, the Association asserted that Messagephone's claims
were excluded from coverage under sections (8) and (9) of article 21.28-D, section (3)(c) of the Insurance
Code. Tex. Ins. Code Ann. art. 21.28-D, § 3(c)(8), (9) (West 1981 & Supp. 1998) (the "1991 Act"). 
Although the 1991 Act did not become effective until January 1, 1992, it states that the Association "may
elect to assume its responsibilities under this Act in proceedings initiated before January 1, 1992." Act of
Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 1.27 (b), 1991 Tex. Gen. Laws 252, 310. The Association
made this election. (7) It now asserts that Messagephone's claims are not covered under section (8) of the
1991 Act. Appellants concede that their claims are not compensable under section (8) but vigorously deny
that the 1991 Act authorizes the Association to elect to apply the later statute to proceedings initiated
before the 1991 Act's effective date. Appellants argue the election provision is unenforceable as an ex
post facto law.

 The Association also relies on section (9) of the 1991 Act to deny coverage of
Messagephone's claims. See Tex. Ins. Code Ann. art. 21.28-D, § 3(c)(9). A verbatim version of this
section was found in section 3(2)(k) of the 1987 Act. If Messagephone's claims are excluded under this
section of the 1987 Act, we must affirm the summary judgment. If not, we must consider whether the
Association could elect to apply the 1991 Act to these claims. Therefore we will first examine whether the
Messagephone claims are compensable under the 1987 Act.



THE 1987 ACT

 Appellants contend that the three contracts are covered by the 1987 Act because it applies
to unallocated annuity contracts which include guaranteed interest contracts. See Act of June 1, 1987, 70th
Leg., R.S., ch. 1073, § 38, 3(1)(a), § 39(14), 1987 Tex. Gen. Laws 3610, 3661, 3663. Although the Act
covers some unallocated annuity contracts it excludes others: "This Act shall apply: (a) to direct life
insurance policies, . . . annuity contracts including unallocated annuity contracts except those
specifically excluded in this Act . . . ." Id. § 38, 3(1)(a) at 3661 (emphasis in the original). The issue
then, is whether these three unallocated annuity contracts were specifically excluded by section 3(2)(k)
which states:


Any portion of a financial guarantee, funding agreement, or guaranteed investment contract
which (1) contains no mortality guarantees and (2) is not issued to or in connection with
a specific employee benefit plan or governmental lottery.



Id. § 38, 3(2)(k) at 3662. The Association claims the three contracts are guaranteed investment contracts
which contain no mortality guarantees and were not issued to or in connection with an employee benefit
plan. In making our determination, we note the paucity of Texas law addressing our concern here. 
Therefore, we must look to other jurisdictions and authorities regarding the meaning and use of the words
we are charged with interpreting.


 A. Guaranteed Investment Contract (GIC)

 Appellants argue the three contracts are "guaranteed interest contracts" or GICs rather than
"guaranteed investment contracts" which are excluded by the statute. Because the Legislature neglected
to define guaranteed investment contract, we rely on its common usage. We find that the financial world
and the insurance industry use the term guaranteed investment contract interchangeably with guaranteed
interest contract and, in fact, refer to each as a "GIC." E.g. Richard G. Mandel, Practicing Law Institute,
Insurance Industry Perspective: Guaranteed Interest Contracts 111 (1991); Jonathan L. Mercier and A.
Richard Susko, Practicing Law Institute, Guaranteed Investment Contracts 291 (1981). While a number
of early GICs were actually called guaranteed interest contracts, over time the term guaranteed investment
contract has become more commonly used. See Hubert V. Forcier, Practicing Law Institute, A GIC
Primer: Terminology, Contract Provisions, How GICs are Used by Plan Sponsors and Competing
Products 17 (1991) (called "guaranteed interest contract" because insurance companies were actually
guaranteeing interest at market rate). However, the term GIC may still refer to either a guaranteed interest
contract or a guaranteed investment contract. See Unisys Corp. v. Penn. Life & Health Ins. Guar.
Ass'n., 667 A.2d 1199, 1202 n.7 (Pa. Commw. Ct. 1995) (term "GIC" is acronym for "guaranteed
investment contract" or "guaranteed interest contract"), aff'd, 684 A.2d 546 (Pa. 1996); see also In re
Unisys Sav. Plan Litigation, 74 F.3d 420, 426 (3d Cir.) (referring to guaranteed investment contract as
"GIC"), cert. denied, 117 S. Ct. 56 (1996); Bennet v. Virginia Life, Accident & Sickness Ins. Guar.
Ass'n, 468 S.E.2d 910 (Va. 1996) (referring throughout to guaranteed interest contract as a "GIC.");
Mandel, supra, at 111. Thus, the distinction between the two terms is merely semantic. Although the
Legislature used the term guaranteed interest contract in one section in the 1987 Act and guaranteed
investment contract in another, (8) we find the two terms are indistinguishable as commonly used by the
financial world, the insurance industry, and the judiciary. We henceforth refer to either as a GIC. (9) 
Furthermore, a review of the nature and function of a GIC and these contracts demonstrates that the
contracts at issue are excluded under section 3(2)(k) whether appellants refer to them as GICs or
guaranteed interest contracts or guaranteed investment contracts.

 Typically, a GIC promises a predetermined return on the principal or contract deposit and
is usually issued for a fixed term of three to five years. (10) "GICs are contracts issued by an insurer which,
under certain conditions, guarantee the return of principal, together with interest at a fixed or specified
minimum rate, on a stated maturity date." Mercier and Susko, supra, at 291; see also "Interest Crediting"
in Walker, Guaranteed Investment Contracts Risk Analysis and Portfolio Strategies, 95 (Dow Jones -
Irwin, Homewood, Illinois 1989). The investment portion of a GIC, with a guaranteed interest for a fixed
term, contains no insurance features. However, a GIC contains a provision permitting the contract holder
to apply accumulated funds toward the purchase of an annuity for individual participants. Forcier, supra, 
at 30. "The guaranteed investment contracts, generally speaking, are deferred annuities under which the
insurance company (in return for lump sum or installment premium payments) promises to pay interest at
a guaranteed rate for the life of the contract and, in addition, allow the insured to buy an annuity with the
monies accumulated under the contract." Harold S. Bloomenthal, 3 Sec. & Fed. Corp. Law § 2.10
(1991-97). A GIC also typically includes a non-transferability clause due to the insurance industry's fear
that such contracts would not be exempt from securities laws and that "book value" accounting would be
lost if the contracts were transferable. Forcier, supra, at 27. 

 In exchange for the three unallocated annuity contracts with a combined face value of
$560,000 Messagephone gave American Equitable an aggregate 130,000 shares of company stock. Part
I of the contracts at issue indicates the face value of the investment, provides for a guaranteed contract
interest rate of twelve-percent payable semi-annually for five years, and promises the initial investment will
be returned in full at the end of the contract. These terms are the very essence of a GIC. See In re Unisys
Sav. Plan Litigation, 74 F.3d at 426 ("A GIC is a contract under which the issuer is obligated to repay
the principal deposit at a designated future date and to pay interest at a specified rate over the duration of
the contract."); Ferry v. Mutual Life Ins. Co. v. New York, 868 F. Supp. 764, 767 n.3 (W.D. Penn.
1994); "Taking Out the 'Guarantee' In the GIC Name," Pensions and Investments, June 10, 1991 at 12
(GIC is a contract between an insurance company and an investor by which the insurance company
promises a certain fixed rate of return for a certain period); see generally Patricia O. McLaughlin, The
American Law Institute, Guaranteed Investment Contracts and Beyond: Investing in and Diversifying out
of Insurance Company General Accounts 145 (1991). Part II of the contracts contains the option for the
contract holder to apply all or a portion of the accumulated funds toward the purchase of an annuity for
eligible individuals. Part III includes a provision barring the assignment or transfer of benefits payable under
the contracts. (11) 

 The present contracts contain the guaranteed payment features of a guaranteed investment
contract along with the annuity option and non-transferability clause common to GICs. Based on the
foregoing discussion, we hold that contracts 43, 44 and 49 are GICs. As previously stated, we find that
the commonly-used acronym GIC refers to either a guaranteed investment contract or a guaranteed interest
contract and thus, the three GICs at issue are "guaranteed investment contract[s]" under the 1987 Act.


 B. Specific Employee Benefit Plan

 Next we determine whether the contracts were issued to or in connection with a specific
employee benefit plan. We first note that the contracts themselves indicate they were issued only to
Messagephone, a corporation. Nowhere on the face of any of the three contracts is an employee benefit
plan mentioned. Furthermore, appellants' discovery responses support this contention:


REQUEST FOR ADMISSION NO. 7: The contracts are not issued to or in connection
with a specific employee benefit plan, or government lottery.


RESPONSE: Admit

For purposes of this analysis we conclude that the contracts were not issued to or in connection with a
specific employee benefit plan.


 C. Mortality Guarantees

 Finally we must determine whether the three contracts contain any mortality guarantees. 
A traditional individual annuity contains a mortality guarantee or risk because it is the mirror image of a life
insurance policy. See American Deposit Corp. v. Schacht, 84 F.3d 834, 840 (7th Cir.), cert. denied,
117 S. Ct. 185 (1996); Variable Annuity Life Ins. Co. v. Clarke, 998 F.2d 1295, 1301 (5th Cir. 1993),
rev'd on other grounds, 115 S. Ct. 810 (1995). With life insurance, the issuing company gambles that
the insured will live longer than predicted; with a lifetime annuity, the issuing company gambles that the
annuitant will not reach her life expectancy. See id. Both life insurance and annuities are formulated on the
basis of actuarial calculations of mortality risk. Variable Annuity Life Ins. Co., 998 F.2d at 1301. The
issuer of a traditional annuity assumes a mortality risk the moment the contract is issued. "That risk is an
actuarial prognostication that a certain number of annuitants will survive to specific ages." American
Deposit Corp., 84 F.3d at 841. 

 By contrast the investment portion of a GIC in no way involves a mortality risk. To
incorporate the business of insurance into this type of investment vehicle, typically GICs include the option
for the contract holder to apply some portion of the accumulated funds towards the purchase of a traditional
annuity "for eligible individuals." The insurance company's obligation to issue an annuity is real when the
contract holder is the manager of an employee benefit plan: individuals will become eligible to withdraw
benefits under the plan due to retirement or termination. Because the insurance company is obligated to
issue a traditional annuity to such eligible individuals it assumes a mortality risk when it issues a GIC with
this annuity option provision to the manager of a benefit plan. But did American Equitable assume any
mortality risk when it issued these contracts with this option to Messagephone, a corporation? We hold
that it did not.

 When an insurance company issues the same investment vehicle to a corporation there are
no "eligible individuals" to exercise the option to purchase an annuity. The option to purchase an annuity
becomes meaningless. The insurance company assumes no mortality risk that a corporate entity will survive
to a certain age based on its gender. Likewise no mortality risk is created by reproducing a mortality table
in the contract: An actuarial prognosis of survival must refer to some individual. Simply adding a mortality
table and an option to purchase an annuity to an investment contract does not create a mortality risk. If
it did, any number of purely financial investments could be transformed into the business of insurance simply
by inserting a mortality table and an annuity option. Under appellants' theory, the Association would then
be responsible for every investment that contained these two boilerplate provisions. The context of these
transactions reflects that these contracts were purchased solely to collateralize commercial financial
transactions--as such they are investment contracts that do not contemplate any individual annuitant and
are not burdened by any mortality risk.

 On motion for rehearing, Messagephone complains that we have collapsed the two prongs
of section 3(2)(k) into a single test--was the contract issued to an employee benefit plan? Because GICs
arose as investment vehicles for employee benefit plans, providing the option to purchase an annuity for an
eligible plan participant clearly creates a mortality risk in that context. We do not hold that a benefit plan
is the only conceivable context in which the insurance company may assume a mortality risk when it issues
a GIC. We do hold that American Equitable did not assume any mortality risk here when the contract
holder was a corporate entity and there were no eligible individuals to exercise the option of purchasing an
annuity. Nor did the mere inclusion of a mortality table in the contract create a mortality risk.

 The Guaranty Act was enacted to cover specific types of insurance contracts. The Act
indicates that the Legislature was capable of drawing stark lines as to which claims are compensable. The
Act does not attempt to provide full coverage for the contractual obligations of all impaired insurers. The
Legislature explicitly excluded several types of contracts and specifically limited the amount of coverage
for included policies. See Tex. Ins. Code Ann. art. 21.28-D, §§ 3(2), 5(4). A guaranteed investment
contract that contains a mortality risk by contemplating some individual or one that is issued to a specific
employee plan is covered under the 1987 Act. However, the Legislature made clear its intention not to
cover an investment contract that is not issued to an employee benefit plan when it does not incorporate
as a real risk mortality guarantees to eligible individuals. We conclude as a matter of law that the three
contracts at issue are guaranteed investment contracts (GICs) which do not contain mortality guarantees
and are not issued to or in connection with a specific employee benefit plan; therefore, they are not covered
under the 1987 Act. Because we hold section 3(2)(k) of the 1987 Act precludes coverage for these
contracts, we need not address whether the Association could elect to apply the 1991 Act to these claims
or any other grounds for summary judgment asserted by appellee. We overrule appellants' two points of
error.


CONCLUSION


 Because we hold contracts numbered 43, 44 and 49 are excluded from coverage under
the 1987 Act as a matter of law, we affirm the judgment of the trial court granting the Association summary
judgment and denying appellants' motion for summary judgment.



 __________________________________________

 Bea Ann Smith, Justice

Before Justices Powers, Aboussie and B. A. Smith

Affirmed

Filed: March 26, 1998

Publish

1. There are two versions of the Guaranty Act involved in this case. For general reference we will refer
to it as the "Act." With regard to a more particularized discussion we refer to it either as the "1987 Act"
or the "1991 Act." See Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 38, 1987 Tex. Gen. Laws
3610, 3661; Act of Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 1.21, 1991 Tex. Gen. Laws 252, 283
(effective January 1, 1992).
2. Although certain contracts purported to assign the annuities, the annuity contracts themselves
provided: "Benefits payable under this contract may not be assigned, transferred or made subject to
surrender, nor applied to the debts of another person in any manner, except as other wise provided in this
contract or by law." We find nothing in any of the contracts which provides for the transfer or assignment
of the contracts.
3. The notes also specifically stated that they were "insured under Chapter 3, Article 21.28-D, Section
5 of the Texas Insurance Code." 
4. See supra note 2.
5. While the record reveals that before the annuity was assigned to Campbell American Equitable
represented to the Texas Department of Insurance that it had actually rescinded and voided any annuity
issued on that particular contract form, Campbell declared he had no knowledge that contract 49 was void
or had been rescinded. 
6. The Association also stated grounds for summary judgment on the basis that (1) the Trust and
Campbell failed to file a statutorily required proof of claim; (2) Messagephone lacked standing to sue; (3)
contract number 49 was void or rescinded by American Equitable; (4) no consideration was exchanged
between MPI and American Equitable because the shares were worthless; and (5) several other grounds. 
7. On appeal, appellants now claim that the Association did not make this election. However, the
Association specifically alleged in a filed response that it had elected in the receivership proceeding to
assume its responsibilities under the 1991 Act. Appellants never objected to this statement of fact; rather
they objected to an interpretation of the Act that would allow the Association to make such an election. 
"Issues not expressly presented to the trial court by written motion, answer or other response shall not be
considered on appeal as grounds for reversal." Tex. R. Civ. P. 166(a).
8. See Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 38, 3(1)(a), (2)(k) § 39(14), 1987 Tex. Gen.
Laws 3610, 3661-663. 
9. These type of investment contracts issued to pension plan managers are also very recently called
"GACs" (group annuity contracts) and "GIAs" (guaranteed interest accounts).
10. The investment is not "guaranteed" by a party other than the issuing insurance company, but the rate
of return is fixed or guaranteed.
11. See supra note 2. Having found no contractual provision that would have allowed Messagephone
to transfer or assign these contracts to a third party, we treat Messagephone as the contract holder for
purposes of our analysis. 


lants' two points of
error.


CONCLUSION


 Because we hold contracts numbered 43, 44 and 49 are excluded from coverage under
the 1987 Act as a matter of law, we affirm the judgment of the trial court granting the Association summary
judgment and denying appellants' motion for summary judgment.



 __________________________________________

 Bea Ann Smith, Justice

Before Justices Powers, Aboussie and B. A. Smith

Affirmed

Filed: March 26, 1998

Publish

1. There are two versions of the Guaranty Act involved in this case. For general reference we will refer
to it as the "Act." With regard to a more particularized discussion we refer to it either as the "1987 Act"
or the "1991 Act." See Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 38, 1987 Tex. Gen. Laws
3610, 3661; Act of Aug. 25, 1991, 72d Leg., 2d C.S., ch. 12, § 1.21, 1991 Tex. Gen. Laws 252, 283
(effective January 1, 1992).
2. Although certain contracts purported to assign the annuities, the annuity contracts themselves
provided: "Benefits payable under this contract may not be assigned, transferred or made subject to
surrender, nor applied to the debts of another person in any manner, except as other wise provided in this
contract or by law." We find nothing in any of the contracts which provides for the transfer or assignment
of the contracts.
3. The notes also specifically stated that they were "insured under Chapter 3, Article 21.28-D, Section
5 of the Texas Insurance Code." 
4. See supra note 2.
5. While the record reveals that before the annuity was assigned to Campbell American Equitable
represented to the Texas Department of Insurance that it had actually rescinded and voided any annuity
issued on that particular contract form, Campbell declared he had no knowledge that contract 49 was void
or had been rescinded. 
6. The Association also stated grounds for summary judgment on the basis that (1) the Trust and
Campbell failed to file a statutorily required proof of claim; (2) Messagephone lacked standing to sue; (3)
contract number 49 was void or rescinded by American Equitable; (4) no consideration was exchanged
between MPI and American Equitable because the shares were worthless; and (5) several other grounds. 
7. On appeal, appellants now claim that the Association did not make this election. However, the
Association specifically alleged in a filed response that it had elected in the receivership proceeding to
assume its responsibilities under the 1991 Act. Appellants never objected to this statement of fact; rather
they objected to an interpretation of the Act that would allow the Association to make such an election. 
"Issues not expressly presented to the trial court by written motion, answer or other response shall not be
considered on appeal as grounds for reversal." Tex. R. Civ. P. 166(a).
8. See Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 38, 3(1)(a), (2)(k) § 39(14), 1987 Tex. Gen.
Laws 3610, 3661-